Stephen G. Traflet
TRAFLET & FABIAN
1001 Avenue of the Americas
11th Floor
New York, NY 10018
(212) 244-6199
straflet@trafletfabian.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL ASSOCIATION,

                Plaintiff,                Civil Action No.: 08cv2540(DC)

vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,        ECF CASE
DENNIS WADE ABLES and JAMES A.
HALL, its General Partners,

                Defendants.

---

## DEFENDANTS' NOTICE OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law
(and any reply Memorandum filed hereafter); the Declaration of Stephen G. Traflet, dated
April 22, 2008, and the exhibits thereto; the Declaration of Darlene Ables dated April 21,
2008, and the exhibits thereto; Plaintiff's Complaint; and all prior pleadings and
proceedings had herein, Defendant Ables & Hall Builders, Ronnie Ables, Dennis Wade
Ables and James A. Hall, by and through their attorneys, Traflet & Fabian, 1001 Avenue

of the Americas, 11th Floor, New York, New York 10018, will move this Court, before

the Honorable Denny Chin, at the Daniel Patrick Moynihan United States Courthouse,

500 Pearl Street, New York, New York, for an Order dismissing, with prejudice, the

Plaintiff's Complaint pursuant to Rules 12(b)(2), 12(b)(3) and 12(b)(6) of the Federal

Rules of Civil Procedure, and granting such other and further relief as this Court may

deem just and proper.

Dated: Morristown, New Jersey
April 22, 2008

Yours, etc.

TRAFLET & FABIAN

/s/ Stephen G. Traflet
STEPHEN G. TRAFLET
1001 Avenue of the Americas
11th Floor
New York, NY  10018
Tel:    212.244.6199
Fax:    212.859.7313

264 South Street
Morristown, NJ  07960
Tel:    973.631.6222
Fax:    973.631.6226
straflet@trafletfabian.com

John David Dyche
Fultz Maddox Hovious & Dickens PLC
2700 National City Tower
101 South Fifth Street
Louisville, KY  40202-3116
Tel:    502.588.2017 (Direct Dial)
jddyche@fmhd.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney duly admitted to practice law before this Court, hereby certifies under penalty of perjury that on April 22, 2008, I caused a true copy of the Notice of Motion to Dismiss Plaintiff's Complaint, Declaration of Stephen G. Traflet in Support of the Motion to Dismiss Plaintiff's Complaint executed on April 22, 2008 with the exhibits annexed thereto; the Declaration of Darlene Ables dated April 21, 2008, and the exhibits thereto; and the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint to be served upon the following by First Class Mail, postage-prepaid:

Moshe Sasson, Esq.
Sasson Blaivas LLP
488 Madison Avenue
18th Floor
New York, NY  10022
Tel:    212.949.7500

Jacob E. Miota, Esq.
Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI  53202-4108
Tel:    414.271.6560

Dated: Morristown, New Jersey
         April 22, 2008

/s/ Stephen G. Traflet
STEPHEN G. TRAFLET

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL ASSOCIATION,

                Plaintiff,                Civil Action No.:  08cv2540(DC)

vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES and JAMES A.         ECF CASE
HALL, its General  Partners,

                Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Stephen G. Traflet
TRAFLET & FABIAN
1001 Avenue of the Americas
11th Floor
New York, NY  10018
Tel:    212.244.6199
straflet@trafletfabian.com


John David Dyche
Fultz Maddox Hovious & Dickens PLC
2700 National City Tower
101 South Fifth Street
Louisville, KY  40202-3116
Tel:    502.588.2017 (Direct Dial)
jdddyche@fmhd.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................3

I.    INTRODUCTION ..................................................................................................6

II.   FACTS ...................................................................................................................7

III.  ARGUMENT

      A.      Summary of Defendants' Arguments ...............................................10

      B.      Kentucky Law Applies to the Threshold Question of Whether the Master Agreement Satisfies the Statute of Frauds ...........................................11

      C.      The Master Agreement Fails to Satisfy Kentucky's Statute of Frauds...............12

      D.      Even if the Master Agreement is Valid, the Consent-to-Jurisdiction Clause Is Unenforceable Under Applicable Federal Common Law................................14

      E.      The Individual Defendants are Not Subject to Personal Jurisdiction Regardless.........................................................................................................17

      F.      Venue in New York is Improper........................................................................19

IV.   CONCLUSION .....................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>**Federal Cases**</u>                                                                                      <u>**Page**</u>

(888) Justice, Inc. v. Just Enterprises, Inc.,
2007 WL 2398504, *5 (S.D.N.Y. 2007)...................................................................19

Ackerley Media Group, Inc. v. Sharp Elecs. Corp.,
170 F. Supp. 2d 445 (S.D.N.Y. 2001).....................................................................11

Alderman v. Pan Am World Airways,
169 F.3d 99 (2d Cir. 1999)......................................................................................11

Astor Holdings, Inc. v. Roski,
2002 WL 72936, *8 (S.D.N.Y. 2002).......................................................................19

Bank of America, N.A. v. Hensley Properties, LP,
495 F. Supp. 2d 435 (S.D.N.Y. 2007).................................................................... 16

Behr Systems, Inc. v. Envirometric Process Controls, Inc.,
2000 WL 33975580, *3 (W.D. Ky. 2000) ...............................................................13

Best Van Lines, Inc. v. Walker,
490 F.3d 239 (2d Cir. 2007)....................................................................................10

Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,
448 F.3d 573 (2d Cir. 2006)....................................................................................11

Bryant Park Capital v. Jelco Ventures,
2005 WL 3466013, *1 (S.D.N.Y. 2005) ..................................................................19

Cortec Indus. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991)........................................................................................9

E.P.A. ex rel. McKeown v. Port Auth. of N.Y. and N.J.,
162 F. Supp. 2d 173 (S.D.N.Y. 2001).....................................................................19

Falik v. Smith,
884 F. Supp. 862 (S.D.N.Y. 1995)..........................................................................18

Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.,
414 F.3d 325 (2d Cir. 2005)....................................................................................13

Global Network Communications, Inc. v. City of New York,
458 F.3d 150 (2d Cir. 2006)........................................................................................9

Guy v. Layman,
932 F. Supp. 180 (E.D. Ky. 1996) ............................................................................18

ICC Indus., Inc. v. Israel Discount Bank, Ltd.,
2005 WL 1844616, *5 (S.D.N.Y. 2005) ...................................................................17

International Shoe v. State of Washington,
326 U.S. 310 (1945)..................................................................................................18

Jones v. Weibrecht,
901 F.2d 17 (2d Cir. 1990).......................................................................................15

Kerobo v. Southwestern Clean Fuels, Corp.,
285 F.3d 531 (6th Cir. 2002) ...................................................................................20

Klaxon Co. v. Stentor Elec. Mfg. Co.,
313 U.S. 487 (1941)..................................................................................................11

Lazard Freres & Co. v. Protective Life Ins. Co.,
108 F.3d 1531 (2d Cir. 1997)...................................................................................11

Lee v. Bankers Trust Co.,
166 F.3d 540 (2d Cir. 1999).....................................................................................11

M/S Bremen v. Zapata Off-Shore Co.,
407 U.S. 1 (1972)......................................................................................................17

Phillips v. Audio Active Ltd.,
494 F.3d 378 (2d Cir. 2007)......................................................................................15

PowerDsine, Inc. v. Broadcom Corp.,
2008 WL 268808, *6 (E.D.N.Y. 2008)......................................................................20

PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,
138 F.3d 65 (2d Cir. 1998).......................................................................................19

Rainforest Café, Inc. v. EklecCo, L.L.C.,
340 F.3d 544 (8th Cir. 2003) ...................................................................................20

Rescuecom Corp. v. Chumley,
522 F. Supp. 2d 429 (N.D.N.Y. 2007) ......................................................................15

Rush v. Savchuk,
444 U.S. 320 (1980)..................................................................................................18

Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.,
927 F. Supp. 731 (S.D.N.Y. 1996)...........................................................................19

Sher v. Johnson,
911 F.2d 1357 (9th Cir. 1990) ................................................................................18


**State Cases**

In re Allstate Ins. Co. (Stolarz),
81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y. 1993)..............................11

Kentucky Utils. Co. v. Hurst Et. Ux.,
269 S.W. 525 (Ky. App. 1925) .................................................................................13

Williamson v. Stafford,
190 S.W.2d 859 (Ky. App. 1945) .............................................................................13


**Rules, Statutes & Restatements**                                                    **Page**

28 U.S.C. §1391 ......................................................................................................19

FED. R. CIV. P. 12(b)(2), 12(b)(3), 12(b)(6) ........................................................6, 20

FED. R. CIV. P. 12(d) ................................................................................................9

KENTUCKY REVISED STATUTES ANNOTATED §371.010 ..............................................12

RESTATEMENT (SECOND) OF CONFLICT OF LAWS §188 ...............................................11

# I.  INTRODUCTION

The defendants have moved for dismissal of this action pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6) on the grounds that they are not subject to personal jurisdiction in New York, venue is improper in New York, and the Complaint fails to state a claim upon which relief may be granted.

None of the parties or events giving rise to this case has any relation to New York.  Plaintiff has nonetheless filed suit in New York for transparently tactical purposes. The Complaint alleges that the defendants consented to personal jurisdiction in New York, but the agreement upon which plaintiff relies is invalid under the applicable statute of frauds (Kentucky's) because none of the defendants signed or is a party to it.

Moreover, the "consent-to-jurisdiction clause" which plaintiff invokes is not enforceable under applicable federal law.  Even if the agreement and the consent-to-jurisdiction clause were otherwise valid, the clause covers only one of the defendants – the general partnership – not the individual defendants.  They are therefore not subject to the clause and there is no basis for subjecting them to personal jurisdiction in New York, which is an extremely distant and inconvenient forum.

Accordingly, the Court should dismiss this case.  Plaintiff can continue attempting to pursue its claims against the defendants in an action pending in federal court in Kentucky[1], which is where all the events giving rise to this dispute actually occurred and where all parties are indisputably subject to personal jurisdiction.

---

[1] The matter Ables & Hall Builders, et al. v. U.S. Bank National Association, Case No. 3:08-CV-00175, is currently pending in the U.S. District Court for the Western District of Kentucky (the "Kentucky Action"), and plaintiff has asserted a Counterclaim in that action which is substantively the same as its Complaint in this action.

## II.  FACTS

Plaintiff, U.S. Bank National Association ("U.S. Bank"), has its principal place of business in Minnesota.  (*See* Declaration of Stephen G. Traflet (hereinafter "Traflet Decl.") at ¶2, Ex. 1 at ¶1.)  The defendants are a Kentucky general partnership and three Kentucky citizens and residents.  (*See* <u>id.</u> at ¶2, Ex. 1 at ¶¶2-5.)

In 2004, defendant Ables & Hall Builders, the general partnership, and other entities of which the individual defendants were owners or otherwise affiliated, had a borrowing relationship with U.S. Bank in connection with certain commercial and residential properties in Kentucky[2].  A U.S. Bank employee represented to them that he could provide more favorable terms by putting the defendants into fixed rate financing with no prepayment penalty.

The representations by the U.S. Bank employee led the defendants, who are unsophisticated borrowers, to believe that the refinancing proposal involved "swapping" a new fixed rate loan package with no prepayment penalty for their existing debt. Instead, U.S. Bank attempted to put Ables & Hall Builders into a much more complex interest rate swap arrangement that would to some extent mimic or provide the benefits of fixed-rate financing.[3]

On June 30, 2004, plaintiff faxed certain documents from its Louisville, Kentucky commercial real estate office (as evidenced by the 502 area code and "Comm Real Estate" designations on the fax legend at the top of the pages) to Ables & Hall Builders at

---

[2] Statements in this section of the Memorandum that are not otherwise attributed are contained in the Verified Complaint in the Kentucky Action and are provided here for purposes of balance and context although the Court need not accept them as true for purposes of the dismissal motion.

[3] A swap agreement is an arrangement in which parties agree to exchange cash flows ("swap") at certain intervals.  In a swap agreement transaction, the amounts on each side of the exchange are calculated by reference to agreed upon financial indices, such as interest rates.  Swap agreements commonly reflect an agreed exchange based on reference to a floating interest rate against a fixed interest rate.

its Louisville, Kentucky office.  Plaintiff instructed Ables & Hall Builders to "sign the ISDA Master Agreement and Schedule where indicated *by the parties specified in the Resolution* …."  (*See* Declaration of Darlene Ables (hereinafter "Ables Decl.") at ¶2, Ex. 1 (June 29, 2004 Letter from Richard Todd of U.S. Bank to defendant Ables & Hall Builders).) (emphasis added).

*None* of the defendants signed or is otherwise a party to the Master Agreement. (It is no doubt for this reason that plaintiff did not attach a copy of the Master Agreement as an exhibit to the Complaint.)  While the three individual defendants are identified as partnership officers in, and are signatories of, the Resolution referred to in U.S. Bank's letter, that Resolution (a copy of which is attached to the Declaration of Darlene Ables as Exhibit 2) does not identify *anyone*, including any of them, as being authorized to execute documents like the Master Agreement, but only identifies the partners. Moreover, the Complaint contains no allegation that the non-party who did sign the Master Agreement, Darlene Ables, was either a partner in Ables & Hall Builders or its authorized agent for purposes of binding the defendants to the Master Agreement.

In 2007, the defendants and other related entities again advised U.S. Bank that they were considering alternative financing.  U.S. Bank advised that it could not match the terms of that alternative financing.  In connection with this refinancing, U.S. Bank again misled the defendants by providing payoff amounts to them that did not contain any reference to any claim that there would be any continuing liability on the interest rate swap arrangement.

Only well after the defendants and their related entities had made a non-refundable deposit to lock-in their new financing did U.S. Bank assert any claim that the

defendants were, by virtue of the interest rate swap arrangement, liable for a sum over and above the previously provided payoffs and provide payoffs which did refer to such a sum. These assertions were in stark contrast to the bank's prior assurances that there was no pre-payment penalty. U.S. Bank first advised that the sum claimed due was $190,000, but allowed it to grow to $456,188.52 before acting to fix its alleged damages at an amount certain.

U.S. Bank filed this action in the Supreme Court of the State of New York, County of New York, on February 5, 2008. The defendants removed the case to this Court.

The Complaint does not allege that any of the defendants has, or ever has had, *any* contacts with or physical presence in New York. The *only* basis plaintiff alleges for personal jurisdiction over the defendants in New York is that, "The parties consented to the jurisdiction of the State Courts of New York in the Master Agreement." (*See* Traflet Decl. at ¶2, Ex. 1 at ¶8.)

The Master Agreement is one of three documents that plaintiff alleges as evidence of the interest rate swap arrangement underlying plaintiff's two causes of action. (*See* Traflet Decl. at ¶2, Ex. 1 at ¶7.) A copy of the Master Agreement is attached to the Declaration of Darlene Ables as Exhibit 3, and a copy of the Schedule to the Master Agreement, which is also referred to in the Complaint, is attached to the Declaration of Darlene Ables as Exhibit 4.[4]

---

[4] Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 47-8 (2d Cir.1991). Thus, a court may consider such materials without converting the motion to dismiss into one for summary judgment as occurs when the court considers other extrinsic materials. FED. R. CIV. P. 12(d); Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006).

# III.  ARGUMENT

## A.    Summary of Defendants' Arguments

The burden lies with the party invoking the court's jurisdiction to establish the existence of that jurisdiction.  Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007).   Plaintiff premises personal jurisdiction over the defendants in New York *exclusively* upon the provisions of Section 11 of the Master Agreement (attached to the Declaration of Darlene Ables as Exhibit 3) and Part 3(e) of the Schedule to the Master Agreement (attached to the Declaration of Darlene Ables as Exhibit 4).

Therefore, to meet its burden plaintiff must establish first that the Master Agreement is a valid and enforceable contract.  If plaintiff is able to do this, it must next show that the clause in the Master Agreement upon which it premises personal jurisdiction over the defendants in New York is itself valid and enforceable.  If plaintiff is able to do this, it must finally show that the clause applies to the individual defendants as well as the defendant general partnership.

Only if it does all three of these things can plaintiff subject the defendants to personal jurisdiction and venue in what is, to them, a very distant court of New York for adjudication of a dispute which is otherwise wholly unrelated to that state.   Absent personal jurisdiction, plaintiff has not asserted an actionable claim.

**B.     Kentucky Law Applies to the Threshold Question of Whether the Master Agreement Satisfies the Statute of Frauds**

A federal court sitting in its diversity jurisdiction applies the substantive law, including choice of law rules, of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999).

"Under New York's choice-of-law rules, the interpretation and validity of a contract is governed by the law of the jurisdiction which is the 'center of gravity' of the transaction."  Alderman v. Pan Am World Airways, 169 F.3d 99, 103 (2d Cir. 1999) (citing Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539-40 (2d Cir. 1997)); Ackerley Media Group, Inc. v. Sharp Elecs. Corp., 170 F. Supp. 2d 445, 450 (S.D.N.Y. 2001).

In such "center of gravity" or "grouping of contacts" analysis, the court considers factors including the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.  Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 583 (2d Cir. 2006) (citing In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y. 1993)); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).

These factors conclusively dictate the application of Kentucky's statute of frauds to the threshold issue of determining the validity of the Master Agreement here.  Kentucky was indisputably the place of the alleged contracting, negotiation and performance of the Master Agreement.  A representative of plaintiff in Kentucky dealt with the defendants in Kentucky.  Plaintiffs do not, and indeed cannot, allege that

*anything* associated with the alleged contracting, negotiation and performance of the Master Agreement happened in New York.

Kentucky is also the location of the subject matter of the alleged contract. The Master Agreement allegedly arises from and relates to borrowing by Kentucky defendants. Plaintiff sent documents from its Kentucky commercial real estate office to defendant Ables & Hall Builders at its Louisville address. Again, plaintiff alleges *nothing* that would put the location of the subject matter of the alleged agreement in New York instead of Kentucky.

Finally, all the defendants are domiciled in Kentucky. (*See* Traflet Decl. at ¶2, Ex. 1 at ¶¶2-5.) Plaintiff is headquartered in Minnesota and transacted this business in Kentucky. (*See* Traflet Decl. at ¶2, Ex. 1 at ¶1.) Aside from the alleged consent to jurisdiction clause, the Complaint is devoid of any substantive averments connecting any of the parties to New York.

Under applicable New York "center of gravity" choice of law analysis, the law of Kentucky applies to the threshold question of whether the Master Agreement is valid and enforceable for purposes of the consent to jurisdiction clause upon which plaintiff places its exclusive reliance for hailing the defendants into the courts of New York.

### C. The Master Agreement Fails to Satisfy Kentucky's Statute of Frauds

Under the Kentucky statute of frauds, a contract must be in writing *"and signed by the party to be charged therewith, or by his authorized agent"* to be enforceable if it will not be performed within one year of its making. KY. REV. STAT. ANN. §371.010(7) (a copy of which is attached to the Declaration of Stephen G. Traflet at Exhibit 2).

(emphasis added). Even if it is possible that a contract may be performed within a year, Kentucky law provides that the statute of frauds still applies if the parties do not anticipate or contemplate performance to be completed within a year. Williamson v. Stafford, 190 S.W.2d 859, 860 (Ky. App. 1945); Kentucky Utils. Co. v. Hurst Et. Ux., 269 S.W. 525 (Ky. App. 1925); Behr Sys., Inc. v. Envirometric Process Controls, Inc., 2000 WL 33975580, at *3 (W.D. Ky. 2000).

The Master Agreement is a form document.[5] This one is dated as of June 29, 2004, but the plaintiff is seeking to enforce it almost four years later. It is therefore obvious that plaintiff neither anticipated nor contemplated that performance of the Master Agreement would be completed within a year. Plaintiff also pleads a provision of the Master Agreement expressly demonstrating its anticipation and contemplation that the agreement would continue in force for as long as "July 1, 2014." (*See* Traflet Decl. at ¶2, Ex. 1 at ¶9.) The Master Agreement therefore comes within the scope of Kentucky's statute of frauds for purposes of the enforceability of the consent-to-jurisdiction clause upon which plaintiff relies.

However, the Master Agreement is *not* signed by any of the parties to this action whom plaintiff seeks to charge with it. The *only* name appearing on the Master Agreement for Ables & Hall Builders is that of "Darlene Ables." Her "title" is shown as "Bookkeeper/Owner," not "partner" or "authorized agent," and neither her name nor signature appear on the Resolution plaintiff provided to Ables & Hall Builders and said it had to have to identify authorized signatories. Plaintiff has not pled, and cannot prove by

---

[5] The International Swaps and Derivatives Association ("ISDA"), the principal industry association of the derivatives industry, publishes a standard form contract known as the "Master Agreement," which is generally used in connection with derivative transactions. Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc., 414 F.3d 325, 327-28 (2d Cir. 2005).

any signed authorization, resolution, or otherwise, that Ms. Ables was a partner or authorized agent of any of the defendants for purposes of the Master Agreement.

Because its performance was not contemplated to be complete within one year, and it is not signed by a party to be charged or an authorized agent thereof, the Master Agreement, and hence the consent to jurisdiction clause in it, is invalid and unenforceable under Kentucky's statute of frauds. This Court should therefore dismiss this action for lack of personal jurisdiction.

### D. Even if the Master Agreement is Valid, the Consent-to-Jurisdiction Clause is Unenforceable Under Applicable Federal Common Law

The provisions upon which plaintiff places exclusive reliance for personal jurisdiction over the defendants in New York read, in their entirety, as follows:

Section 11 of the Master Agreement

(b) **_Jurisdiction._**  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

> (i)      submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)      waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982

or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdiction preclude the bringing of Proceedings in any other jurisdiction.

Part 3(e) of the Schedule to the Master Agreement

(e)    ***Governing Law.***    This Agreement will be governed by and construed in accordance with the laws of the state of New York (without reference to choice of law doctrine).

"[T]he legal standard governing consent-to-jurisdiction clauses is the same as the legal standard governing forum-selection clauses." Rescuecom Corp. v. Chumley, 522 F. Supp. 2d 429, 444 (N.D.N.Y. 2007). When adjudicating diversity cases, federal courts apply federal law to determine the enforceability of a contractual forum selection clause. Jones v. Weibrecht, 901 F.2d 17, 19 (2d Cir. 1990).

The U. S. Court of Appeals for the Second Circuit has recently set forth a four-part analytical framework for determining whether to enforce such clauses. It is:

1.    Was the clause reasonably communicated to the party resisting enforcement?

2.    Is the clause as mandatory or permissive, *i.e.*, are the parties are required to bring any dispute to the designated forum or simply permitted to do so?

3.    Are the claims and parties involved in the suit subject to the forum selection clause?

4.    If *each* of these three questions is answered in the affirmative, the clause is presumptively enforceable, and the resisting party must make a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.

Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84 (2d Cir. 2007).

Here, there is no basis for concluding that the clause was reasonably communicated to the defendants since *none* of them signed or otherwise acknowledged the document containing the clause. The clause is clearly permissive since it refers only to the "non-exclusive jurisdiction of the courts of the State of New York" and provides that, "Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction … nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction."

While the claims involved in the suit may be subject to the clause, there is simply no basis upon which the Court can conclude that the parties to the suit are subject to it since none of them signed or otherwise acknowledged the document containing the clause. It would also be unreasonable and unjust to enforce the consent-to-jurisdiction clause against the defendants in this case.

In a recent and factually similar situation, Judge Marrero of this Court refused to enforce the same New York consent-to-jurisdiction clause in the same ISDA Master Agreement form contract that is involved in this action when, as here, the party against whom enforcement was sought did not sign the Master Agreement and "neither the parties nor the events and transactions at issue have any connection with New York." Bank of America, N.A. v. Hensley Properties, LP, 495 F. Supp. 2d 435, 439 (S.D.N.Y. 2007). Finding that enforcement would be unreasonable and unjust and that the totality of circumstances "weigh compellingly in favor of conducting this litigation in the Eastern District of California" (the place where the defendant was located and the events related to the alleged swap transaction took place), he transferred that case there.

Since plaintiff cannot satisfy the elements of the applicable test, the clause is not presumptively enforceable. Even if plaintiff could satisfy these elements, however, the clause would still be "unreasonable under the circumstances" and therefore unenforceable against the defendants here. M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). Trial in New York will be so difficult, expensive, and inconvenient for the defendants, all of whom are domiciled in Kentucky, that they will effectively be deprived of their day in court.[6]

Thus, even if the Master Agreement were valid under the Kentucky statute of frauds, the consent-to-jurisdiction clause upon which plaintiffs rely is not enforceable under the controlling federal law as set forth by the Second Circuit. Dismissal is required for this reason as well.

### E.     The Individual Defendants are Not Subject to Personal Jurisdiction Regardless

Even if the Master Agreement is valid under the Kentucky statute of frauds *and* the consent-to-jurisdiction clause is enforceable under federal common law, that clause provides jurisdiction *only* over defendant Ables & Hall Builders, a Kentucky general partnership, and not over the individual defendants. Since none of the individual defendants are parties to the Master Agreement or signed it, plaintiff evidently contends that if the Ables & Hall Builders partnership is subject to personal jurisdiction in New York by virtue of the consent-to-jurisdiction clause then the individual partners are also subject to personal jurisdiction in New York.

---

[6] Even a court with proper jurisdiction and venue over a matter may refrain from hearing the case if another significantly more appropriate forum exists, as is the case with Kentucky here. ICC Indus., Inc. v. Israel Discount Bank, Ltd., 2005 WL 1844616, at *5 (S.D.N.Y. 2005).

However, a court does not acquire jurisdiction over individual partners by virtue of having jurisdiction over a partnership.  Jurisdiction must be established over each partner by considering the contacts of the partner with the forum state.  <u>Falik v. Smith</u>, 884 F. Supp. 862, 866 (S.D.N.Y. 1995).  *See also* <u>Guy v. Layman</u>, 932 F. Supp. 180 (E.D. Ky. 1996); <u>Sher v. Johnson</u>, 911 F.2d 1357, 1365-66 (9th Cir. 1990).  These cases, and others, stand for the proposition that personal jurisdiction depends only upon each defendant's relationship with the forum, and regardless of any potential joint liability, jurisdiction over each defendant must be established individually.  <u>Rush v. Savchuk</u>, 444 U.S. 320 (1980)

Thus, regardless of how the Court rules on the validity of the Master Agreement or the enforceability of the consent-to-jurisdiction clause as to Ables & Hall Builders general partnership, plaintiff simply cannot meet its burden of showing contacts by the individual defendants with New York constitutionally sufficient to support personal jurisdiction over them there.  <u>International Shoe v. State of Washington</u>, 326 U.S. 310 (1945).  Accordingly, the Court should dismiss the individual defendants from this action.

### F.    Venue in New York is Improper

The Court should also, or alternatively, dismiss this action because of improper venue as to the underlying state court action.  PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 72 (2d Cir. 1998).  "A defendant who has removed a case may still challenge the propriety of venue in the state court from which the case was removed."  Bryant Park Capital v. Jelco Ventures, 2005 WL 3466013, at *1 (S.D.N.Y. 2005).  Put differently, the federal venue statute, 28 U.S.C. § 1391, does not control the propriety of venue in a state court case that is removed to federal court.

On a motion to dismiss for improper venue, the plaintiff bears the burden of demonstrating proper venue.  E.P.A. ex rel. McKeown v. Port Auth. of N.Y. and N.J., 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001); (888) Justice, Inc. v. Just Enters., Inc., 2007 WL 2398504, at *5 (S.D.N.Y. 2007).  Where, as here, a case involves more than one defendant, or more than one claim against a defendant, venue must be proper as to each defendant and as to each claim.  Astor Holdings, Inc. v. Roski, 2002 WL 72936, at *8 (S.D.N.Y. 2002).  Thus, in cases like this one involving multiple claims, proper venue must be established with respect to each cause of action asserted.  Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C., 927 F. Supp. 731, 736 (S.D.N.Y. 1996).  Plaintiff cannot meet this burden, especially as to the individual defendants.

The Complaint does not contain a separate allegation as to venue.  There are no allegations in the Complaint that would support venue in New York by virtue of the residency or acts of any of the defendants.  Plaintiff apparently relies on Section 11(b) of the Master Agreement and Part 3(e) of the Schedule for venue just as it does for personal jurisdiction.  However, as demonstrated above in connection with personal jurisdiction,

these provisions are an insufficient basis for venue in New York as against any of the defendants since the Master Agreement is invalid under the applicable statute of frauds as demonstrated above.

Even if the Master Agreement was valid and supported New York venue as to Ables & Hall Builders, however, the individual defendants are not parties to it and have not in any way, shape, or form waived their objections to venue.  Their motion to dismiss for improper venue must therefore be considered on its merits regardless.  PowerDsine, Inc. v. Broadcom Corp., 2008 WL 268808, at *6 (E.D.N.Y. 2008).  And, again, there are no allegations in the Complaint that would support venue in New York by virtue of the residency or acts of any of the individual defendants.  Since Count II of the Complaint relates only to the individual defendants, plaintiff plainly cannot meet its burden of establishing venue as to each defendant and claim.

Whether it does so under Rule 12(b)(3) or 12(b)(6)[7], the Court should dismiss this action for improper venue.

## IV.  CONCLUSION

As demonstrated above, the defendants are not subject to personal jurisdiction in New York, venue is improper in New York, and the complaint fails to state a claim upon which relief may be granted.  No party or conduct in this action has any relation to New York.  It is especially clear that there is no basis for personal jurisdiction or venue over the individual defendants in New York, and this alone compels dismissal.  Kentucky is

---

[7]  Because there is some dispute as to whether Rule 12(b)(3) or Rule 12(b)(6) is the proper vehicle for bringing a motion to dismiss based on improper venue when the issue turns to some extent on a forum selection clause, the defendants move here pursuant to both.  See Kerobo v. Southwestern Clean Fuels, Corp., 285 F.3d 531, 534-36 (6th Cir. 2002); Rainforest Cafe, Inc. v. EklecCo, L.L.C., 340 F.3d 544, 546 (8th Cir. 2003).

the correct place for adjudication of this dispute since all the events giving rise to it took

place there and all parties are subject to personal jurisdiction there.    Accordingly, the

Court should grant defendants' motion and dismiss this action.

Dated: Morristown, New Jersey
        April 22, 2008

/s/ Stephen G. Traflet
Stephen G. Traflet (ST-9654)
TRAFLET & FABIAN
1001 Avenue of the Americas
11th Floor
New York, NY  10018
Tel:    212.244.6199

264 South Street
Morristown, NJ  07960
Tel:    973.631.6222
straflet@trafletfabian.com


John David Dyche
Fultz Maddox Hovious & Dickens PLC
2700 National City Tower
101 South Fifth Street
Louisville, KY  40202-3116
Tel:    502.588.2017 (Direct Dial)
jddyche@fmhd.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney duly admitted to practice law before this Court, hereby certifies under penalty of perjury that onApril 22, 2008, I caused a true copy of the Notice of Motion to Dismiss Plaintiff's Complaint, Declaration of Stephen G. Traflet in Support of the Motion to Dismiss Plaintiff's Complaint executed onApril 22, 2008 with the exhibits annexed thereto; the Declaration of Darlene Ables dated April 21, 2008 and the exhibits thereto; and the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint to be served upon the following by First Class Mail, postage-prepaid:

Moshe Sasson, Esq.
Sasson Blaivas LLP
488 Madison Avenue
18th Floor
New York, NY  10022
Tel:     212.949.7500

Jacob E. Miota, Esq.
Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI  53202-4108
Tel:     414.271.6560

Dated: Morristown, New Jersey
           April 22, 2008

/s/ Stephen G. Traflet
STEPHEN G. TRAFLET

Stephen G. Traflet
TRAFLET & FABIAN
1001 Avenue of the Americas
11th Floor
New York, NY 10018
(212) 244-6199
straflet@trafletfabian.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL ASSOCIATION,

              Plaintiff,

vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES and JAMES A.
HALL, its General Partners,

              Defendants.

Civil Action No.: 08cv2540(DC)

ECF CASE

---

### DECLARATION OF STEPHEN G. TRAFLET IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I, STEPHEN G. TRAFLET, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.    I am an attorney-at-law of the State of New York, and the United States District Court for the Southern District of New York, and am a partner in the firm of Traflet & Fabian, attorneys for Defendants ABLES & HALL BUILDERS, RONNIE ABLES, DENNIS WADE ABLES and JAMES A. HALL. I make this Declaration in

1

support of Defendants' Motion to Dismiss Plaintiff's Complaint. I make this Declaration based on my own personal knowledge.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of plaintiff's Complaint against defendants filed in the Supreme Court of the State of New York, New York County.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of Kentucky Revised Statute Annotated §371.010.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 22, 2008 at Morristown, New Jersey.

/s/ Stephen G. Traflet
STEPHEN G. TRAFLET

2

## CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this Court, hereby certifies under penalty of perjury that on April 22, 2008, I caused a true copy of the Notice of Motion to Dismiss Plaintiff's Complaint, Declaration of Stephen G. Traflet in Support of the Motion to Dismiss Plaintiff's Complaint executed on April 22, 2008 with the exhibits annexed thereto; the Declaration of Darlene Ables dated April 21, 2008, and the exhibits thereto; and the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint to be served upon the following by First Class Mail, postage-prepaid:

> Moshe Sasson, Esq.
> Sasson Blaivas LLP
> 488 Madison Avenue
> 18th Floor
> New York, NY 10022
> Tel:    212.949.7500

> Jacob E. Miota, Esq.
> Michael Best & Friedrich LLP
> 100 East Wisconsin Avenue
> Suite 3300
> Milwaukee, WI 53202-4108
> Tel:    414.271.6560

Dated: Morristown, New Jersey
　　　　April 22, 2008

/s/ Stephen G. Traflet
STEPHEN G. TRAFLET

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

---------------------------------------------------------------x

U.S. BANK NATIONAL ASSOCIATION

        Plaintiff,

      vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES, and JAMES A. HALL,
its General Partners,

        Defendants.

---------------------------------------------------------------x

Index No.: 600342/08.

Filing Date: 2/5/08

**SUMMONS**

The basis of venue in New York
County is CPLR 503(a)

**NEW YORK
COUNTY CLERK'S OFFICE**

FEB 05 2008

**NOT COMPARED
WITH COPY FILE**

TO:  **ABLES & HALL BUILDERS
7919 ARNOLDTOWN ROAD
LOUISVILLE, KY 40214**

     **RONNIE ABLES
7919 ARNOLDTOWN ROAD
LOUISVILLE, KY 40214**

     **DENNIS WADE ABLES
7919 ARNOLDTOWN ROAD
LOUISVILLE, KY 40214**

     **JAMES A. HALL,
7919 ARNOLDTOWN ROAD
LOUISVILLE, KY 40214**

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and

to serve a copy of your answer, or, if the complaint is not served with this summons, to

serve a notice of appearance, on the Plaintiff's Attorneys within twenty (20) days after

the service of this summons, exclusive of the day of service (or within thirty (30) days

after the service is complete if this summons is not personally delivered to you within the

State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Dated:        New York, New York
              February 5, 2008

                                   SASSON BLAIVAS LLP

                                   By: Moshe Sasson, Esq.
                                   Attorneys for Plaintiff
                                   488 Madison Avenue, 18th Floor
                                   New York, New York 10022
                                   (212) 949-7500

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------x

U.S. BANK NATIONAL ASSOCIATION,

        Plaintiff,

      vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES, and JAMES A. HALL,
its General Partners,

        Defendants.

--------------------------------------------------------------x

Index No.: 600342/08

**COMPLAINT**

NEW YORK
COUNTY CLERKS OFFICE

FEB 05 2008

NOT COMPARED
WITH COPY FILE

Plaintiff U.S. Bank National Association (the "Bank"), by its attorneys, Michael Best &

Friedrich LLP and Sasson Blaivas LLP, as and for its Complaint against Defendants Ables &

Hall Builders (the "Borrower") and its General Partners listed herein alleges and shows to the

Court as follows:

### PARTIES

1.    U.S. Bank National Association (the "Bank") is a bank organized under the laws

of the United States with its headquarters in Minneapolis, Minnesota.

2.    Ables & Hall Builders, upon information and belief, is a Kentucky General

Partnership organized under the laws of Kentucky.

3.    Mr. Ronnie Ables, upon information and belief, is an adult resident and citizen of

Kentucky and is one of the General Partners of Ables & Hall Builders.

4.    Mr. Dennis Wade Ables, upon information and belief, is an adult resident and

citizen of Kentucky and is one of the General Partners of Ables & Hall Builders.

5.    Mr. James A. Hall, upon information and belief, is an adult resident and citizen of

Kentucky and is one of the General Partners of Ables & Hall Builders.

## FACTS

6.    In 2004, the Borrower and the Bank entered into an interest rate swap transaction. In this interest rate swap transaction, the Borrower agreed to pay the Bank a monthly fixed rate of 5.07%, adding a credit spread of 2.25% on the underlying loans, for an effective rate of 7.32% per annum based upon a notional amount of $7,893,000.00. In return, the Bank agreed to pay the Borrower monthly payments at a floating, or variable, rate of the U.S. Dollar LIBOR interest rate based upon a notional amount of $7,893,000.00.

7.    The terms of the parties' mutual obligations in the interest rate swap transaction were evidenced by three documents. The first is entitled the "ISDA Master Agreement," dated June 29, 2004 ("Master Agreement") and is a standard agreement issued by International Swap Dealers Association Incorporated ("ISDA") and which is one of a series of similar forms published by the ISDA which governs almost all interest rate swap transactions in the United States.   The second is entitled "Schedule to the Master Agreement" ("Schedule") dated June 29, 2004 and relates to and modifies the Master Agreement. The third is a "Confirmation" dated November 5, 2004 from the Bank to the Borrower reiterating the financial terms and procedures in the interest rate swap transaction.

8.    Pursuant to Section 11(b) of the Master Agreement and Part 3(e) of the Schedule, the interest rate swap transaction is governed by the laws of New York. The parties consented to the jurisdiction of the State Courts of New York in the Master Agreement.

9.    The interest rate swap transaction had a number of benefits for the Borrower. For example, by entering into the interest rate swap transaction, the Borrower was able to reduce its effective interest rate on $7,893,000.00 of debt from 7.70% to 7.32%. Under the interest rate swap transaction, if the LIBOR rate for any month was higher than 5.07%, the Bank would pay

- 2 -

From: 502 935 0438    Page: 5/8    Date: 2/17/2008 9:44:00 AM

the Borrower the difference in the interest rate. On the other hand, if the LIBOR rate was lower than 5.07% for any given month, the Borrower would pay the Bank. From July 2006 to November 2007, the LIBOR rate was higher than 5.07% and the Borrower therefore collected some $25,749.00 in monthly payments from the Bank. Conversely, since November of 2007, the LIBOR rate has dropped below 5.07% and the Borrower owed money to the Bank for those months. The parties agreed that if the interest rate swap transaction was terminated prior to July 1, 2014 for any reason, the interest rate swap would be "marked-to-market" and the Borrower would be a payor or a payee of the Bank, depending upon the prevailing market swap rates. By entering into the transaction, the Borrower also avoided a $59,564.00 prepayment premium which would have been due on its then fixed rate loan.

10. On January 24, 2008, the Borrower triggered an Additional Termination Event when it refinanced its underlying indebtedness to the Bank with another financial institution. Part 1(g) of the Schedule in Section 6(b)(iii)(2) of the Master Agreement provides that "as to [the Borrower] an Additional Termination Event shall occur upon termination of any agreement between [the Bank] and [the Borrower]."

11. After the above-described Additional Termination Event occurred, the Bank, pursuant to Section 6(b)(iii) of the Master Agreement, notified the Borrower and designated an early termination date of January 31, 2008. Upon termination of the interest rate swap transaction, the Bank determined a Settlement Amount of $456,188.52 owed to the Bank under Section 6(e) of the Master Agreement. Under Section 6(d)(ii) of the Master Agreement, the Borrower's payment of this amount was due two (2) business days after the date of the notice, or by February 4, 2008. However, as of the date of this Complaint, the Borrower has not paid the money owed to the Bank.

- 3 -

12.    Pursuant to Section 6(d)(ii) of the Master Agreement, the Bank is entitled to charge interest on the money due it from the Borrower at a rate equal to the Bank's cost of funds plus 1%. Pursuant to Section 9 of the Master Agreement, the Bank also is entitled to its costs of collection, including attorneys' fees, if the Borrower does not pay.

### FIRST CAUSE OF ACTION
### (Breach Of Contract -- Borrower)

13.    The Bank hereby realleges and incorporates Paragraphs 1 through 12 of the Complaint as if fully set forth herein.

14.    The Borrower triggered an Additional Termination Event pursuant to Part 1(g) of the Schedule under the interest rate swap transaction when it refinanced its underlying obligations with a different financial institution.

15.    Section 6(e) of the Master Agreement provides a method for calculating the Bank's damages resulting from the Borrower's breach. Pursuant to those calculations, and as a result of the Borrower's breach, the Borrower owes the Bank $456,188.52, calculated pursuant to Section 6(e) of the Master Agreement, plus interest and attorneys' fees in collecting this money.

### SECOND CAUSE OF ACTION
### (Breach Of Contract -- General Partners)

16.    The Bank hereby realleges and incorporates Paragraphs 1 through 15 of the Complaint as if fully set forth herein.

17.    The General Partners are jointly and severally liable for the debts and obligations of the Borrower pursuant to Kentucky partnership law, K.R.S. §§ 362.010 *et seq.* Therefore, they each are jointly and severally liable to the Bank for the marked-to-market swap value.

- 4 -

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

WHEREFORE, Plaintiff U.S. Bank National Association demands judgment against Defendants, jointly and severely, in the amount of $456,188.52, plus contractual interest, attorneys' fees and costs and disbursements of this action, together with such further and additional relief as this Court deems just and proper.

Dated:    New York, New York
          February 5, 2008

                              SASSON BLAIVAS LLP
                              Attorneys for Plaintiff U.S. Bank National
                              Association

                              By: _____
                                  Moshe Sasson, Esq.
                                  488 Madison Avenue, 18th Floor
                                  New York, New York 10022
                                  Phone (212) 949-7500

OF COUNSEL:

Michael Best & Friedrich LLP
Jacob E. Miota, Esq.
100 East Wisconsin Avenue
Suite 3300
Milwaukee, Wisconsin 53202-4108
Phone (414) 271-6560

- 5 -

Index No. _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
————————————————————————————————X

U.S. BANK NATIONAL ASSOCIATION,

              Plaintiff,

    vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES, and JAMES A. HALL,
its General Partners,

           Defendants.

————————————————————————————————X

## SUMMONS AND COMPLAINT

SASSON BLAIVAS LLP
*Attorneys for Plaintiff*
488 Madison, 18th Floor
New York, New York 10022
212-949-7500

# EXHIBIT 2

### 371.010  Statute of frauds -- Contracts to be written.

No action shall be brought to charge any person:

(1)  For any representation or assurance concerning the character, conduct, credit, ability, trade, or dealings of another, made with intent that such other may obtain thereby credit, money, or goods;

(2)  Upon any promise to pay a debt contracted during infancy, or any ratification of a contract or promise made during infancy;

(3)  Upon any promise of a personal representative as such to answer any liability of his decedent out of his own estate;

(4)  Upon any promise to answer for the debt, default, or misdoing of another;

(5)  Upon any agreement made in consideration of marriage, except mutual promises to marry;

(6)  Upon any contract for the sale of real estate, or any lease thereof for longer than one year;

(7)  Upon any agreement that is not to be performed within one year from the making thereof;

(8)  Upon any promise, agreement, or contract for any commission or compensation for the sale or lease of any real estate or for assisting another in the sale or lease of any real estate; or

(9)  Upon any promise, contract, agreement, undertaking, or commitment to loan money, to grant, extend, or renew credit, or make any financial accommodation to establish or assist a business enterprise or an existing business enterprise including, but not limited to the purchase of realty or real property, but this subsection shall not apply to agreements pursuant to which credit is extended by means of a credit card or similar device, or to consumer credit transactions;

unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent. It shall not be necessary to express the consideration in the writing, but it may be proved when necessary or disproved by parol or other evidence.

**Effective:** July 13, 1990

**History:**  Amended 1990 Ky. Acts ch. 259, sec. 1, effective July 13, 1990. -- Amended 1950 Ky. Acts ch. 174, sec. 1. -- Recodified 1942 Ky. Acts ch. 208, sec. 1, effective October 1, 1942, from Ky. Stat. sec. 470.

Stephen G. Traflet
TRAFLET & FABIAN
1001 Avenue of the Americas
11th Floor
New York, NY 10018
(212) 244-6199
straflet@trafletfabian.com

Attorneys for Defendants
Ables & Hall Builders, Ronnie Ables,
Dennis Wade Ables and James A. Hall

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL ASSOCIATION,

          Plaintiff,

vs.

ABLES & HALL BUILDERS, a Kentucky
General Partnership; RONNIE ABLES,
DENNIS WADE ABLES and JAMES A.
HALL, its General Partners,

          Defendants.

Civil Action No.: 08cv2540(DC)

ECF CASE

---

**DECLARATION OF DARLENE ABLES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

I, DARLENE ABLES, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.     I am over 18 years of age and make this Declaration in support of

Defendants' Motion to Dismiss Plaintiff's Complaint based on my own personal

knowledge.

1

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the letter dated June 29, 2004 from Richard Todd of U.S. Bank addressed to defendant Ables & Hall Builders, but sent to my attention.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the form of Resolution/Authorization for Entering into Interest Rate Swaps, Caps Collars and Floors, as referenced in the June 29, 2004 letter from Richard Todd and as returned to him.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the Master Agreement, as referenced in the June 29, 2004 letter from Richard Todd and as returned to him.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the Schedule to the Master Agreement dates as of June 29, 2004 as referenced in the June 29, 2004 letter from Richard Todd and as returned to him.

6.      I am not a general partner of Ables & Hall Builders, a Kentucky general partnership.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 21, 2008 at Louisville, Kentucky.

DARLENE ABLES

2

# EXHIBIT 1

June 29, 2004

Ables & Hall Builders
ATTN: Darlene Ables
7919 Arnoldtown Road
Louisville, Kentucky 40214

Re:    Derivatives Facility with U.S. Bank National Association

Dear Darlene:

Enclosed for your review and execution are the following documents which will establish a
derivatives facility between Ables & Hall Builders, a Kentucky partnership (the "Company") and
U.S. Bank National Association ("U.S. Bank"):

1.    ISDA Master Agreement;

2.    ISDA Schedule;

3.    Resolution for Entering into Interest Rate Swaps, Caps, Collars and Floors
       ("Resolution"); and

4.    Cross-Collateralization Agreement.

The above documents are referred to as (the "Derivatives Documentation").

Please note that the enclosed documents only establish the general terms of future derivative
transactions between U.S. Bank and the Company, and that the specifics of each derivative
transactions will be mutually negotiated at a later date and subject to finalization after execution
of each derivative transaction by U.S. Bank's delivery to the Company of a Confirmation
Agreement. Furthermore, please note that the enclosed documents do not constitute an offer to
purchase a derivatives product.

After reviewing the Derivatives Documentation, please contact me if you have any questions or
you believe any substantive changes are required in the documentation. Please note that the
ISDA agreements are industry standard agreements, and to promote our sale of swap positions in
the marketplace, few substantive changes can be made to the preprinted forms.

If the Derivatives Documentation is acceptable, please sign the ISDA Master Agreement and
Schedule where indicated by the parties specified in the Resolution and return the completed
Derivatives Documentation to me as soon as possible. U.S. Bank must have the original
executed Derivatives Documentation in hand prior to finalizing any derivatives transactions.

As you know, derivatives transactions are complex and there are various risks associated with
such transactions. Consequently, U.S. Bank urges you to consult with the appropriate tax, legal

and accounting advisors prior to executing the enclosed Derivatives Documentation so that you may fully understand how the Derivatives Documentation and derivatives transactions will affect the Company.

Should you have any questions regarding this letter, please contact me.  I look forward to working with you in the future.

Sincerely,


Richard Todd, V.P.
U.S. Bank Capital Markets Group

Enclosures
cc:   Relationship Manager (w/enc)
T:\clients\034052\0150\AHBLTR.1

# EXHIBIT 2

## RESOLUTION/AUTHORIZATION
## FOR ENTERING INTO INTEREST RATE SWAPS,
## CAPS, COLLARS AND FLOORS

## ABLES & HALL BUILDERS, A KENTUCKY PARTNERSHIP

WHEREAS, this organization wishes to enter into interest rate swaps caps, collars and floors with U.S. Bank National Association (the "Bank") from time to time;

NOW, THEREFORE, RESOLVED, that the representatives of this organization are authorized and directed to execute and deliver that certain ISDA Master Agreement dated effective June 29, 2004 and the Schedule dated June 29, 2004 (collectively "Agreement") and supplemented by the confirmations relating to the transactions under the Agreement, which Agreement was and is a requirement of certain loans, leases and other financing accommodations to the organization and its affiliates entered into with the Bank.

FURTHER RESOLVED, that any of the representatives of this organization denoted below:  [mark authorized representatives]

☐ Chairman of the Board          ☐ Treasurer          ☐ Member
☐ President                      ☐ Secretary          ☐ Manager
☐ Any Vice President             ☐ General Partner     ☐ [Other] _____

is (are) authorized, on behalf of and in the name of this organization, (i) to make, execute, seal with the organization's seal and deliver to the Bank, from time to time, agreements concerning interest rate swaps, caps, collars and floors such terms and conditions as said representative(s) shall approve and (ii) to pledge, assign, mortgage or otherwise grant a security interest in any or all real property, fixtures, tangible or intangible personal property, or any other assets of this organization, to execute, seal with the organization's seal and deliver to the Bank such security agreements, assignments, financing statements, real estate mortgages, assignments of life insurance, agreements not to encumber, or other agreements respecting any or all interests in real or personal property now owned or hereafter acquired by this organization as may be requested by the Bank to secure any obligations of this organization to the Bank, now existing or hereafter arising, all upon such terms and conditions as said representative(s) shall approve, and to perform such acts required of this organization in such agreements or otherwise to perfect such security interests.  The signature(s) of said representative(s) appearing on any of the foregoing instruments shall be conclusive evidence of (his/her) (their) approval thereof.

FURTHER RESOLVED, that the authority granted to the representatives of this organization shall continue in full force and effect, and said Bank may rely thereon in dealing with such representatives, unless and until written notice of any change in or revocation of such authority shall be delivered to said Bank to the attention of Commercial Loan Operations by a representative of this organization, and any action taken by said representatives and relied on by said Bank pursuant to the authority granted herein prior to its receipt of such written notice shall be fully and conclusively binding on this organization.

FURTHER RESOLVED, that the actions of any representative of this organization heretofore taken in entering into interest rate swaps, caps, collars and floors with the Bank and in securing such indebtedness in any manner authorized herein, be and the same hereby are in all respects ratified, confirmed and approved.

FURTHER RESOLVED, that in consideration of the financial accommodations made by the Bank to this organization, this organization shall be authorized to and shall assume full responsibility for and hold the Bank harmless from any and all payments made or any other actions taken by the Bank in reliance upon the signatures, including facsimiles thereof, of any person or persons holding the offices of this organization designated above regardless of whether or not the use of the facsimile signature was unlawful or unauthorized and regardless of by whom or by what means the purported signature or facsimile signature may have been affixed to any instrument if such signatures reasonably resemble the specimen or facsimile signatures as provided to the Bank, or for refusing to honor any signatures not provided to the Bank; and that this organization agrees to indemnify the Bank against any and all claims, demands, losses, costs, damages or expenses suffered or incurred by the Bank resulting from or arising out of any such payment or other action.

FURTHER RESOLVED, that the Secretary, Assistant Secretary or any other representative of this organization is authorized and directed to certify to the Bank the foregoing resolutions and that the provisions thereof are in conformity with the Articles of Incorporation or other association agreement of this organization, and to certify to the Bank the names of the persons now holding the offices referred to above and any changes hereafter in the persons holding said offices together with specimens of the signatures of such present and future representatives.

I HEREBY CERTIFY that I am the duly elected, qualified and acting ____*Owners*____ and the custodian of the records of Ables & Hall Builders, a Kentucky partnership; that the foregoing is a true and correct copy of resolutions/authorizations duly adopted by the organization in accordance with law and its governance agreements on the _*30th*_ day of June, 2004, and that such resolutions/authorizations are now in full force and effect without modifications, and are duly recorded.

I FURTHER CERTIFY that set forth below are the true titles, names and genuine signatures of the duly elected or appointed, qualified and acting representatives of the organization presently holding such offices who are authorized under the foregoing resolutions:

| | Name* | Signature* |
|---|---|---|
| Chairman of the Board | | |
| President | x WADE ABLES | Wade Ables |
| Vice President | x RONNI ALLEC | Ronnie able |
| | | |
| Treasurer | | |
| Secretary | JAMES A HALL | James A Hall |
| Other | TOM SOLLEY | Tom Solley by Ronnie Ables |
| | Title 1/4 owner  Name of Airport Storage | |

IN WITNESS WHEREOF, I have affixed my name in my official capacity, and have caused the seal of the organization to be hereunto affixed, this _____ day of June, 2004.

(SEAL) N/A

* Only the names and signatures of representatives who will act in this transaction need be inserted.

T:\clients\034062\015\AHBRES.1

# EXHIBIT 3

(Local Currency – Single Jurisdiction)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

## dated as of June 29, 2004

U.S. Bank National Association and Ables & Hall Builders, a Kentucky partnership, have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.    **Interpretation**

(a)  *Definitions.*  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)  *Inconsistency.*  In the event of any inconsistency between the provision of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provision of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)  *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)  *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.

(iii).    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

Second Printing

(b) *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c) *Netting.* If on any date amounts would otherwise be payable:

      (i)    in the same currency; and

      (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d) *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

### 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:

(a) *Basic Representations.*

      (i)    *Status.* It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

      (ii)   *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

      (iii)  *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

2

ISDA® 1992<br/>Second Printing

    (iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:

(a) *Furnish Specified Information.* It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) *Maintain Authorizations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

5.    **Events of Default and Termination Events**

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:

    (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery

ISDA® 1992
Second Printing

under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

    (1)    failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

    (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

    (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

    (1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting

4

ISDA® 1992
Second Printing

creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:

    (1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

    (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of an event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):

    (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

    (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity,

ISDA® 1992
Second Printing

as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereof, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate.* If

(1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination is then continuing.

6

ISDA® 1992
Second Printing

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

**(d) Calculations.**

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

**(e) Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting

ISDA® 1992
Second Printing

Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events*. If the Early Termination Date results from a Termination Event:

    (1)    *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively; and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

    (2)    *Two Affected Parties*. If there are two Affected Parties:

        (A)    If Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

        (B)    If Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:

    (a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

    (b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8

ISDA® 1992
Second Printing

8.    Miscellaneous

(a) *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments*. No amendment modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidence by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electric messaging system.

(c) *Survival of Obligations*. Without prejudice to Sections 2(e)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations*.

  (i)  This Agreement (and each amendment, modification, and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

  (ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right power or privilege will not be presumed to preclude any subsequent or further exercise, of that right power or privilege or the exercise of any other right power or privilege.

(g) *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

10.    Notices

(a) *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:

  (i)  if in writing and delivered in person or by courier on the date it is delivered;

  (ii)  if sent by telex, on the day the recipient's answerback is received;

ISDA© 1992
Second Printing

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

ISDA® 1992
Second Printing

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:

    (a) in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (b) in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

    (c) in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

    (d) in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and "lawful" and "unlawful" will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notices contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or

11

ISDA® 1992
Second Printing

delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means with respect to a party and any Early Termination Date, the sum of:

(a) The Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

12

ISDA® 1992
Second Printing

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Event*" means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

[SIGNATURE PAGE TO FOLLOW]

ISDA© 1992
Second Printing

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**U.S. BANK
NATIONAL ASSOCIATION**

By: _____
Name: _____
Title: _____
Date: _____

**ABLES & HALL BUILDERS**

By: _Ables & Hall Builders (Willie Ables)_
Name: _Darlene Ables_
Title: _Bookkeeper / Owner_
Date: _7/1/04_

T:\clients\034057\0150\AHBISDA.1

14

# EXHIBIT 4

(Local Currency-Single Jurisdiction)

## SCHEDULE to the MASTER AGREEMENT
### dated as of June 29, 2004
#### between
### U.S. BANK NATIONAL ASSOCIATION ("Party A")
#### and
### ABLES & HALL BUILDERS, A KENTUCKY PARTNERSHIP ("Party B")

**Part 1:  Termination Provisions and Certain Other Matters**

(a)      *"Specified Entity"* means, in relation to Party A, for the purpose of:

Section 5(a)(v), none;

Section 5(a)(vi), none;

Section 5(a)(vii), none; and

Section 5(b)(ii), none;

and, in relation to Party B, for the purpose of:

Section 5(a)(v), All Affiliates;

Section 5(a)(vi), All Affiliates;

Section 5(a)(vii), All Affiliates; and

Section 5(b)(ii), All Affiliates.

(b)      *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)      The *"Cross-Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.  In connection therewith,

*"Specified Indebtedness"* will have the meaning specified in Section 12, except that such term shall not include obligations in respect of deposits received in the ordinary course of a party's banking business, and

*"Threshold Amount"* means, in relation to Party A an amount equal to Ten Million

Dollars ($10,000,000.00), and in relation to Party B an amount equal to One Million Dollars ($1,000,000.00).

(d)     The *"Credit Event Upon Merger"* provision of Section 5(b)(ii) will apply to Party A and Party B; provided, however, that the phrase "materially weaker" means that the actual or implied Credit Rating of (A) the senior long-term debt of the resulting, surviving or transferee entity is rated less than BBB- by Standard & Poor's Corporation or Baa3 by Moody's Investors Service Inc., or (B) in the event that there are no such Standard & Poor's Corporation or Moody's Investors Service, Inc. ratings, the Policies (as defined below) in effect at the time, of the party which is not the Affected Party, would lead such non-Affected Party, solely as a result of a change in the nature, character, identity or condition of the Affected Party from its state (as a party to this Agreement) prior to such consolidation, amalgamation, merger or transfer, to decline to make an extension of credit to, or enter into a Transaction with, the resulting, surviving or transferee entity. "Policies", for the purposes of this definition means: (x)(i) internal credit limits applicable to individual entities or (ii) other limits on doing business with entities domiciled or doing business in certain jurisdictions or engaging in certain activities, or (y) internal restrictions on doing business with entities with whom the party which is not the Affected Party has had prior adverse business relations.

In addition, Section 5(b)(ii) is hereby amended by:

(i)     deleting in the fourth line thereof the words "another entity" and replacing them with the words "or receives all or substantially all of the assets of another entity or reorganizes, incorporates, reincorporates, or reconstitutes into or as, another entity or X, such Credit Support Provider, or such Specified Entity, as the case may be, effects a recapitalization, liquidating dividend, leveraged buy-out, other similar highly-leveraged transaction, redemption of indebtedness, or stock buy-back or similar call on equity or enters into any agreement providing for the foregoing."

(ii)    deleting in the fifth line thereof the words "the resulting, surviving or transferee" and replacing them with the words "X or any resulting, surviving, transferee, reorganized, or recapitalized", and

(iii)   deleting in the seventh line thereof the words "its successor or transferee" and replacing them with the words "any resulting, surviving, transferee, reorganized, or recapitalized entity."

(e)     The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A. As to Party B, Automatic Early Termination shall apply.

2

(f)  *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement:

    (i)    Market Quotation will apply.

    (ii)    The Second Method will apply.

(g)  *Additional Termination Event* will not apply to Party A. As to Party B, an Additional Termination Event shall occur upon termination of any agreements between Party A (or any Affiliate of Party A) and Party B (or any Specified Entity of or Credit Support Provider for Party B). For the purpose of the foregoing Termination Event, the Affected Party shall be Party B and the non-Affected Party shall be Party A.

## Part 2: Agreement to Deliver Documents

| Party Required To Deliver Document | Form/Document/ Certificate | Date By Which To Be Delivered | Covered By Section 3(d) Representation |
|---|---|---|---|
| Party B | Certified copies of all resolutions and authorizations and any other documents with respect to the execution, delivery and performance of this Agreement satisfactory to Party A | Upon execution and delivery of this Agreement | Yes |
| Party B | Certificate of authority and specimen signatures of individuals executing this Agreement and Confirmations | Upon execution and delivery of this Agreement and thereafter, upon request of the other Party | Yes |
| Party B | Consolidated and consolidating balance sheet and income statements — quarterly (unaudited) and annually (audited) | Upon request of Party A | Yes |
| Party B | A cross-collateralization agreement satisfactory to Party A from Party B and any Credit Support Providers for Party B, plus all other agreements deemed necessary by Party A to evidence such cross-collateralization satisfactory to Party A | Upon execution and delivery of this Agreement | Yes |

Part 3. Miscellaneous

    (a)    *Address for Notices.* For the Purpose of Section 10(a) of this Agreement:

Any notice shall be delivered to the address or facsimile or telex number specified in the relevant Confirmation of a Transaction. For Purposes of Sections 5 and 6 of this Agreement, any notice shall also be delivered to the following address:

Address for notice or communications to Party A:

> U.S. Bank National Association
> ATTN: Randy Bailey / Derivative Operations
> 800 Nicollet Mall
> Mail Location: BC-MN-H18S
> Minneapolis, Minnesota 55402
> (612) 303-4128 Phone
> (612) 303-1353 Fax

Address for notice or communications to Party B:

> Ables & Hall Builders
> ATTN: Darlene Ables
> 7919 Arnoldtown Road
> Louisville, Kentucky 40214
> (502) 935-0438 Phone
> (502) 935-0438 Fax

    (b)    *Calculation Agent.* The Calculation Agent is Party A.

    (c)    *Credit Support Document.* Credit Support Document is not applicable in relation to Party A. Credit Support Document is applicable in relation to Party B and shall mean each agreement and instrument, now or hereafter existing, of any kind or nature which secures, guarantees or otherwise provides direct or indirect assurance of payment or performance of any existing or future obligation of Party B under this Agreement, made by or on behalf of any person or entity (including, without limiting the generality of the foregoing, any credit or loan agreement, note, reimbursement agreement, security agreement, mortgage, pledge agreement, assignment of rents or any other agreement or instrument granting any lien, security interest, assignment, charge or encumbrance to secure any such obligation, any guaranty, suretyship, letter of credit or subordination agreement relating to any such obligation and any "keep well" or other financial support agreement relating to Party B or any Credit Support Provider) in favor of Party A or any of its Affiliates.

4

    (d)    *Credit Support Provider.* Credit Support Provider is not applicable in relation to Party A. Credit Support Provider is not applicable in relation to Party B.

    (e)    *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the state of New York (without reference to choice of law doctrine).

    (f)    *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

## Part 4. Other Provisions

    (a)    *Set-off.* Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(ii) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this section.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this section shall be effective to create a charge or other security interest. This section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which a party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

    (b)    *Exchange of Confirmations.* For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation, via telex or facsimile transmission. Party B agrees to respond to such Confirmation within 5 Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein. Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of the terms contained in such Confirmation, absent manifest error. The parties agree that any such exchange of telexes or facsimile transmissions shall constitute a Confirmation for all

5

purposes hereunder.

(c) *Waiver of Right to Trial by Jury.* EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(d) *Telephonic Recording.* Each party (i) consents to the recording of the telephone conversations of trading and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction and (ii) agrees to obtain any necessary consent of, and give notice of such recording to, such personnel of it and its Affiliates.

(e) *Relationship Between Parties.* Section 3 of the Agreement is amended by adding the following as subsection (e):

"(e) <u>Relationship Between Parties.</u> Absent a written agreement to the contrary:

(i) It is not relying on any advice (whether written or oral) of the other party regarding any Transaction, other than the representations expressly made by that other party in this Agreement and in the Confirmation in respect of that Transaction;

(ii) In respect of each Transaction under this Agreement,

(1) it has the capacity to evaluate (internally or through independent professional advice) that Transaction and has made its own decision to enter into that Transaction;

(2) it understands the terms, conditions and risks of that Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks; and

(3) the other party (a) is not acting as a investment or commodity trading advisor for it; (b) has not given to it (directly or indirectly through any other person) any assurance, guaranty or representation whatsoever as to the merits (either legal, regulatory, tax, financial, accounting or otherwise) of that Transaction or any documentation related thereto; and (c) has not committed to unwind that Transaction."

(f) *FDIC Requirements.*

(i) <u>Corporate Authority.</u> Each party ("X") hereby represents and warrants at all times until termination of this Agreement that X, by appropriate corporate action, is authorized under applicable law to enter into this Agreement, as evidenced by the execution hereof by an officer of X of the level of vice president or higher.

6

(ii)  FIRREA Qualified Financial Contract. Each party recognizes and intends that each Transaction entered into under this Agreement is, and shall constitute, a "qualified financial contract" as that term is defined in Section 212 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended, modified, or supplemented from time to time.

Accepted and agreed:

**U.S. BANK
NATIONAL ASSOCIATION**

**ABLES & HALL BUILDERS**

By:_____

By: _Ables & Hall Builders_

Name:_____

Name: _Darlene Ables_

Title:_____

Title: _Bookkeeper/owner_

T:\clients\034062\0150\AHBSCHBD.1

7