UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
U.S. BANK NATIONAL ASSOCIATION,
                                    :
                Plaintiff,          :          **OPINION**
                                    :
          - against -               :          08 Civ. 2540 (DC)
                                    :
ABLES & HALL BUILDERS, a Kentucky
General Partnership, RONNIE ABLES,  :
DENNIS WADE ABLES, and JAMES A.
HALL, its General Partners,         :

                Defendants.         :

- - - - - - - - - - - - - - - - - -x

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #:                        │
│ DATE FILED: 3/19/10           │
└──────────────────────────────┘
```

**APPEARANCES:**          (See last page.)

**CHIN, District Judge**

          In this breach of contract case, plaintiff U.S. Bank
National Association (the "Bank") sues defendants Ables & Hall
Builders (the "Partnership"), Ronnie Ables ("Ronnie"), Dennis
Wade Ables ("Wade"), and James Hall to enforce the terms of an
interest rate swap transaction.  Defendants assert several
defenses as well as counter-claims for declaratory relief,
misrepresentation, breach of fiduciary duty, and breach of the
covenant of good faith and fair dealing.  Both parties move for
summary judgment.  For the reasons set forth below, the Bank's
motion is granted and defendants' motion is denied.

BACKGROUND

          The basic terms and structure of the swap transaction
are not disputed.  The parties disagree about certain facts
relating to whether the terms of the transaction are enforceable.
The facts set forth below are drawn from the parties' Rule 56.1

statements (where the facts are undisputed), as well as from deposition transcripts, declarations, and exhibits.  Whenever conflicts in the evidence are material, they have been resolved in favor of defendants.

## A.    **Undisputed Facts**

### 1.    **Background**

The Partnership is a general partnership among Ronnie, Wade, and Hall.  (Defendants' Rule 56.1 Statement ("Def. Stmt.") ¶ 2; Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl. Resp.") ¶ 2).  Ables & Hall Builders, Inc. (the "Corporation") is a corporation owned by Ronnie, Wade, and Hall. (Def. Stmt. ¶ 4; Pl. Resp. ¶ 4).  The two businesses are separate entities.  (Id.).  Along with a third entity, Airport Storage, LLC,[1] the Partnership and the Corporation had seven mortgage loans with the Bank, totaling about $7.5 million in May 2004. (Id.).  Together, I refer to the Partnership, the Corporation, and Airport Storage, LLC as the "entities."

Darlene Ables ("Darlene") is Wade's wife and the bookkeeper for both the Partnership and the Corporation.  (Def. Stmt. ¶ 5; Pl. Resp. ¶ 5).  In mid-May 2004, Darlene contacted the Bank to inquire about obtaining a lower interest rate on the entities' seven mortgage loans.  (Id.).  A representative of the

---

[1] Airport Storage LLC is a corporation owned by Ronnie, Wade, Hall, and a fourth, non-party individual, Tom Solley. (Def. Stmt. ¶ 4; Pl. Resp. ¶ 4).

Bank, Paul Gelhausen, recommended a "blend and extend" transaction through an interest rate swap transaction.  (Id.).[2]

## 2.  **The Proposed Transaction**

The "interest rate swap transaction" that Gelhausen proposed would be reflected in separate agreements between the Partnership and the Bank, and it would be used to achieve a lower net interest rate on the entities' seven mortgages.

The first step would be to convert the interest rate on the mortgage loans from a fixed-rate of about 7.70% to a floating rate equal to the monthly LIBOR (London Interbank Offered Rate) plus 2.25%.  (Plaintiff's Proposed Findings of Fact[3] ("Pl. Stmt.") ¶ 24; Defendants' Response to Plaintiff's Proposed Findings of Fact ("Def. Resp.") ¶ 24; Miota 8/28/09 Decl. Ex. 9, ISDA Master Agreement ("Master Agreement"); Miota 8/28/09 Decl. Ex. 11, Confirmation ("Confirmation")).

Next, the Partnership and the Bank would execute a separate contract where the Bank and the Partnership would agree

---

[2] "In a swap transaction, two parties commit to exchange payment flows with each other based upon mutually agreed indices, such as interest rates or foreign exchange rates.  Payments are exchanged on dates specified in the agreement.  Swap agreements typically provide for the posting of collateral to secure a party's exposure and for the early termination of a swap transaction if one party's exposure grows too large, as defined by the agreements between the parties."  Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 118, 130 n.6 (S.D.N.Y. 2000).

[3] Plaintiff has mislabeled its Rule 56.1 Statement "Plaintiff's Proposed Findings of Fact."  The Court is not finding facts in the context of this motion, however, and the statement is only cited when the facts contained therein are undisputed by defendants.

to exchange monthly interest payments based on a "notional" figure equal to the mortgage principal.  (Id.).[4]  The Bank would pay a monthly interest rate equal to the LIBOR, and the Partnership would pay a monthly interest rate equal to 5.07%. (Id.).

The final result across the three payment streams would be that the entities would pay a net interest rate of 7.32% on their mortgages -- a savings of 38 basis points.  (Pl. Stmt. ¶ 24; Def. Resp. ¶ 24).  The Partnership's position would be hedged -- as the LIBOR went up, the interest rate on the entities' mortgages became less favorable, but the monthly payments on the swap transaction became more favorable.  The Bank also hedged its position by going onto the market and entering into an opposite interest rate swap transaction with a third party.  (Def. Stmt. ¶ 53; Pl. Resp. ¶ 53).  Neither side was exposed to any risk, whether the LIBOR increased or decreased over time.

### 2.   **The Terms of the Swap Transaction**

The terms of the swap transaction were memorialized in three documents.  The Master Agreement and Schedule are standard forms issued by the International Swap Dealers Association, and they establish the general terms governing the transaction. (Def. Stmt. ¶ 17; Pl. Resp. ¶ 17; Pl. Stmt. ¶ 26; Def. Resp. ¶

---

[4]   The figure is "notional" because it exists only as a concept.  According to Treasury Regulations, "interest rate swaps" are one breed of "notional principle contracts" that "provide[] for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount."  26 C.F.R. § 1.446-3(c)(1)(i).

26).  The Confirmation describes the specific financial terms of the transaction, and sets a termination date of July 1, 2014. (Pl. Stmt. ¶¶ 28, 35; Def. Resp. ¶¶ 28, 35; Confirmation at 2).

The Master Agreement and Schedule provide for "Events of Default" and "Termination Events."  (Master Agreement §§ 5(b), 6(e); Schedule Part I(g)).  The Schedule states that an "Additional Termination Event" will occur "upon termination of any agreements between [the Bank] and [the Partnership]." (Schedule Part I(g)).  Upon occurrence of an "Additional Termination Event," the Master Agreement requires a "payment upon early termination."  (Master Agreement §§ 6(e), 12; Confirmation Part I(f)).  This payment is calculated by seeking three quotations for the current market value of the interest rate swap.  (Id.).  Depending on the state of the LIBOR at the time of termination, either the Bank or the Partnership would be liable for the "payment upon early termination."

### 3.   Darlene Signs the Master Agreement and Schedule

Gelhausen and another Bank representative, Greg Buckhout, met with Ronnie and Hall in June 2004 to discuss the proposed swap transaction.  (Pl. Stmt. ¶¶ 18-19; Def. Resp. ¶¶ 18-19).  On June 30, 2004, Gelhausen faxed some documents to the Partnership's office, to Darlene's attention.  (Pl. Stmt. ¶ 23; Def. Resp. ¶ 23; Def. Stmt. ¶ 15; Pl. Resp. ¶ 15).  The documents were:  the Master Agreement, the Schedule, and a "Resolution" form.  (Id.).

The Resolution was designed to designate the individuals who were authorized to enter into the swap transaction on behalf of the Partnership.  (Def. Stmt ¶ 20; Pl. Resp. ¶ 20; Miota 8/28/09 Decl. Ex. 8, Resolution ("Resolution")).  Wade Ables, Ronnie Ables, James Hall, and Tom Solley signed the Resolution document on June 30, 2004.  (Def. Stmt. ¶ 21; Pl. Resp. ¶ 21; Resolution).

Although she was not authorized by the Resolution document, Darlene Ables nevertheless signed the Master Agreement and Schedule on July 1, 2004 -- purportedly on behalf of the Partnership.  (Def. Stmt. ¶¶ 21, 23; Pl. Resp. ¶¶ 21, 23; Master Agreement; Schedule).

In early July, Gelhausen spoke to Ronnie to lock in the combined interest rate of 7.32% on the entities' seven mortgages. (Pl. Stmt. ¶ 24; Def. Resp. ¶ 24).  The Confirmation document, setting forth the monthly interest rates payable by the Bank and by the Partnership on the swap transaction, was faxed to the Partnership's office on July 2, 2004, but no one signed the document at that time.  (Pl. Stmt. ¶¶ 35, 36; Def. Resp. ¶¶ 35, 36; Confirmation).

### 4.   <u>Ronnie Signs the Confirmation</u>

Gelhausen "discovered" in August 2004 that Darlene was <u>not</u> authorized by the Resolution to have signed the Master Agreement and Schedule on behalf of the Partnership.  (Def. Stmt. ¶ 42; Pl. Resp. ¶ 42).  Gelhausen was concerned that the Partnership had not yet signed the Confirmation.  (Def. Stmt. ¶

43; Pl. Resp. ¶ 43).  He began calling Ronnie repeatedly.  (Miota 8/28/09 Decl. Ex. 4, Deposition of Ronnie Ables ("Ronnie Depo.") at 29).  Ronnie spoke to Gelhausen "every day," and Gelhausen was "threatening" to "sue" the Partnership.  (Id. at 29, 38).

Ronnie refused to sign the Confirmation, purportedly, because "he didn't understand it," and because the Bank was requiring the Partnership to do a lot of "expensive" things, such as procure "floodplain certificates" for the mortgaged properties.  (Id. at 29-30).  He also states that he does not "read well," although he never mentioned this fact to Gelhausen.  (Id. at 39).  In this time frame, Ronnie met with an attorney, Bruce Neikirk, to consult about the swap transaction.  (Def. Stmt. ¶ 45; Pl. Resp. ¶ 45; Pl. Stmt. ¶ 43; Def. Resp. ¶ 43; Ronnie Depo. at 28-29).  Neikirk telephoned Gelhausen.  (Pl. Stmt. ¶ 44; Def. Resp. ¶ 44).  In September 2004, Gelhausen sent five letters to Neikirk about the swap transaction.  (Pl. Stmt. ¶¶ 45-50; Def. Resp. ¶¶ 45-50; Miota 8/28/09 Decl. Ex. 13-18, Letters from Paul Gelhausen to Bruce Neikirk).

In the letters to Neikirk, Gelhausen summarized the terms of the transaction, described the way in which it operated to lower the entities' overall mortgage interest rate, attached copies of the Master Agreement and Schedule (both signed by Darlene), listed all of the entities' affected loans, provided estimates of the costs if the mortgage loans were to be paid-off

early and if the Master Agreement's "payment upon early termination" clause were to be triggered.  (Id.).[5]

On October 1, 2004, Gelhausen faxed a copy of the Confirmation to Neikirk seeking execution by the Partnership. (Pl. Stmt. ¶ 50; Def. Resp. ¶ 50).  Ronnie signed the Confirmation sometime in October 2004.  (Pl. Stmt. ¶ 36; Def. Resp. ¶ 36).  On November 5, 2004, Darlene signed an amended Confirmation that changed only the due date for monthly settlement payments -- from the first day of every month to the eighth day of every month.  (Pl. Stmt. ¶¶ 53-54; Def. Resp. ¶¶ 53-54; Miota 8/28/09 Decl. Ex. 12., Amended Confirmation).

## 5.   **Performance Under the Agreement**

The Partnership performed its obligations under the swap transaction documents for a period of about three years by exchanging monthly payments with the Bank.  (Pl. Stmt. ¶ 58; Def. Resp. ¶ 58).  Between August 1, 2004 and January 8, 2008, the Bank and the Partnership exchanged monthly payments under the agreement a total of 41 times.  (Id.).  As a result of the transaction, the entities paid a lower net interest rate on their mortgage loans with the Bank.  (Pl. Stmt. ¶ 24; Def. Resp. ¶ 24).

---

[5] Defendants do not dispute that Gelhausen sent five letters to Neikirk in September 2004.  (Def. Resp. ¶¶ 45-50).  Defendants do argue, however, that the letters are inadmissible hearsay. This objection is overruled, however, because the letters are not offered for "the truth of the matter asserted."  See Fed. R. Evid. 801(c).  Rather, the letters are offered as evidence of the fact that the Bank sent five letters to Attorney Neikirk on the subject of the swap transaction.

6.    **The End of the Swap Transaction**

        In the summer of 2007, the entities began to inquire
about lowering their mortgage interest rate again.  (Pl. Stmt. ¶
61; Def. Resp. ¶ 61).  In July 2007, the Bank sent payoff numbers
for the entities' mortgages with no reference to any liability
for termination of the swap transaction.  (Def. Stmt. ¶ 48; Pl.
Resp. ¶ 48).  On September 24, 2007, Douglas Sutton, a Bank
representative, sent an email to Darlene about refinancing the
entities' loans.  (Pl. Stmt. ¶ 62; Def. Resp. ¶ 62; Miota 8/28/09
Decl. Ex. 20, Email from Douglas Sutton to Darlene Ables ("Sutton
Email")).[6]  The email did provide notice of a termination cost,
as it stated:  "as I reminded you yesterday, refinancing these
loans would require unwinding the swap you have with [the Bank]."
(Id.).

        By the end of 2007, the entities had decided to
refinance their mortgage loans with another bank.  (Pl. Stmt. ¶
63; Def. Resp. ¶ 63).  On December 27, 2007, plaintiff's
attorney, Alexander Fraser, wrote a letter to defendants' new
attorney, James Babbitz.  (Miota 9/18/09 Decl. Ex 3, Letter from
Alexander Fraser to James Babbitz).  This letter warned the
Partnership that payoff of the mortgages would also terminate the

---

        [6] Defendants do not dispute that Sutton sent this email to
Darlene.  (Def. Resp. ¶ 62).  They do argue that the email is
inadmissible hearsay.  The objection is overruled for the same
reasons as defendants' earlier hearsay objection:  the email is
not offered for the truth of the matters asserted within it; it
is offered to establish that Sutton did, in fact, send an email
about the consequences of terminating the mortgages.

swap transaction, which would result in the Bank charging the Partnership a "payment upon early termination."  (Id.).

On January 4, 2008, the Partnership paid off all its Bank loans.  (Pl. Stmt. ¶ 65; Def. Resp. ¶ 65).  During January 2008, the Bank and the Partnership discussed the Bank's contention that the payoff of the loans had triggered termination of the swap transaction, and that the Partnership owed the Bank a "payment upon early termination."  (Pl. Stmt. ¶ 67; Def. Resp. ¶ 67).  The parties did not resolve the issue.  (Id.).  On January 31, 2008, Jonathan York, a Bank representative, sent a letter to the Partnership demanding a "payment upon early termination" of $456,188.52.  (Pl. Stmt. ¶ 68; Def. Resp. ¶ 68; Miota 8/28/09 Decl. Ex. 21, Letter from Jonathan York to Darlene Ables).[7] Defendants have not paid the Bank.

## B.  Defendants' Contentions

Defendants imply (but never affirmatively state) that Darlene was <u>not</u> authorized to sign the Master Agreement and Schedule on behalf of the Partnership, and that the terms of the swap transaction are therefore unenforceable.  (Def. Stmt. ¶¶ 23-29; Def. Mem. in Supp. of Def. Mot. for Summ. Judg. at 18-19).  They contend that the Bank did not have good reason to believe that Darlene had such authority because none of the partners ever

---

[7] Defendants' hearsay objection to the Court's consideration of this letter is overruled for the same reasons that the previous two objections were overruled.

did anything to mislead the Bank about Darlene's authority.
(Def. Stmt. ¶¶ 23-29).

Defendants contend that in June 2004, Gelhausen
misrepresented the nature of the swap transaction by telling
Ronnie that the transaction would involve nothing more than
"swapping one loan to the other loan with very little bit of
paperwork" and that there would be a "fixed rate," no "closing
cost," and no "prepayment penalty." (Def. Stat. ¶ 12; Ronnie
Depo. 12-13).

Defendants also contend that it was misleading for the
Bank to "provide the defendants with payoff amounts for the
[mortgage] Facilities that did not contain any reference to any
liability on the interest rate swap arrangement upon payoff of
the [mortgage] Facilities." (Def. Stmt. ¶ 48).

Finally, Defendants contend that the Bank acted as a
fiduciary in relation to defendants because they sought to gain
defendants' "trust" and "confidence." (Traflet 9/18/09 Decl. Ex.
1, Gelhausen Deposition at 20-21; Miota 8/28/09 Decl. Ex. 3, Joe
Eilerman Deposition at 22). The Bank admits that it sought
defendants' "trust" and "confidence," but deny that this created
a fiduciary duty.

## C.  **Prior Proceedings**

On February 5, 2008, the Bank filed suit against
defendants in New York state court, alleging breach of contract
and demanding damages of $456,188.52, plus interest and
attorneys' fees. On March 13, 2008, defendants removed the case

to this Court under 28 U.S.C. § 1446(a).  Defendants invoked this
Court's jurisdiction based on diversity of citizenship of the
parties.

Subsequent to the filing of this action, defendants
filed suit against plaintiff in the United States District Court
for the Western District of Kentucky.  On May 23, 2008, the
District Court stayed that proceeding pursuant to the "first-to-
file" rule.  See Ables & Hall Builders v. U.S. Bank, No. 08-175
(JGH), 2008 U.S. Dist. LEXIS 41284, at **5-6 (W.D. Ky. May 23,
2008).

On April 22, 2008, defendants filed a motion to dismiss
the Bank's complaint pursuant to Federal Rules of Civil Procedure
12(b)(2), (3), and (6).  I denied the motion on October 27, 2008.
See U.S. Bank v. Ables & Hall Builders, 582 F. Supp. 2d 605
(S.D.N.Y. 2008).  After a period of discovery, this motion
followed.

## DISCUSSION

The Bank seeks to enforce the swap transaction, and to
recover the "payment upon early termination."  Defendants argue
that the contract is unenforceable because (1) Darlene did not
have actual or apparent authority to sign the Master Agreement
and Schedule on behalf of the Partnership; (2) the Bank has
misinterpreted the terms of the contract in bad faith; and (3)
the Bank has failed to mitigate its damages.  Defendants also
seek adjudication of their counter-claims for misrepresentation,
breach of fiduciary duty, and breach of the covenant of good

faith and fair dealing. For the reasons set forth below, all of defendants' arguments are rejected, and judgment will be entered in favor of the Bank.

## A.   Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178 (2d Cir. 2008). In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the Court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return

a verdict for the [non-moving party] on the evidence presented."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
Because the Court's role is limited in this respect, it may not
make factual findings, determine credibility of witnesses, or
weigh evidence.  See Jeffreys v. City of New York, 426 F.3d 549,
554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84
F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634,
644 (2d Cir. 1994).

A court faced with cross-motions for summary judgment
need not "grant judgment as a matter of law for one side or the
other," but "'must evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable
inferences against the party whose motion is under
consideration.'"  Heublein, Inc. v. United States, 996 F.2d 1455,
1461 (2d Cir. 1993) (quoting Schwabenbauer v. Bd. of Ed. of
Olean, 667 F.2d 305, 313-14 (2d Cir. 1981)).

B.    **Contract Principles**

The swap transaction contains a New York choice-of-law
clause.  (Pl. Stmt. ¶ 92; Def. Resp. ¶ 92; Schedule Part III(e)).
Though defendants assert that Kentucky law ought to apply, they
consent to the application of New York law because of the lack of
conflict between the two states' laws.  (Def. Mem. in Supp. of
Def. Mot. for Summ. Judg. at 15).  Accordingly, I apply New York
law.

1.   **Is the Swap Transaction Enforceable?**

    a.   **Applicable Law**

Under New York law, an agent's authority to transact business on behalf of her principal may be "actual" or "apparent." Actual authority exists when, at the time that an agent "takes action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." RLI Ins. Co. v. Athan Contracting Corp., 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009) (quoting Restatement (Third) of Agency, § 2.01). Apparent authority, on the other hand, "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Id. at 234 (quoting Restatement (Third) of Agency, § 2.03).

Even if an agent acts without actual or apparent authority, a principal may become liable for her actions by manifesting assent, or by engaging in conduct that justifies a reasonable assumption that the principal consents. See In re First Republic Group Realty, LLC., 421 B.R. 659, 682 (Bankr. S.D.N.Y. 2009) (citing Restatement (Third) of Agency §§ 4.01(2)(a)-(b)). To ratify a prior transaction, the principal must have knowledge of all the material facts involved in the transaction. See Breen Air Freight, Ltd. v. Air Cargo, Inc., 470

F.2d 767, 773 (2d Cir. 1972).  "One circumstance which clearly evidences an affirmative election to consent to the unauthorized acts of another is the acceptance of the benefits of the agent's misdeeds, with knowledge."  Orix Credit Alliance v. Phillips-Mahnen, Inc., No. 89-8376 (THK), 1993 WL 183766, *5 (S.D.N.Y. May 26, 1993) (citing Restatement (Second) of Agency §§ 93 cmt. a, 98).

### b.  **Application**

Defendants argue that the swap transaction is unenforceable because the Bank did not have reason to believe that Darlene had authority to sign the Master Agreement and Schedule on July 1, 2004.  I need not decide whether Darlene had actual or apparent authority to sign.  Regardless of Darlene's authority on July 1, 2004, the Partnership ratified the transaction when Ronnie signed the Confirmation in October 2004 and the Partnership performed and received benefits pursuant to the transaction for more than three years.

Regardless of Ronnie's reading level or internal thought process, every outward manifestation indicated that Ronnie gave his affirmative consent to bind the Partnership to the swap transaction.  He never told Gelhausen that he did not read well.  (Id. at 39).  Rather, from the perspective of the Bank, Ronnie was more than fully informed about what he was signing.  First, Ronnie spoke to Gelhausen "every day" about the transaction; then, he consulted an independent attorney; then, Gelhausen sent the attorney explanatory letters, including copies

of the signed Master Agreement and Schedule; and finally, Ronnie decided to sign the Confirmation.  In sum, Ronnie "engag[ed] in conduct that justifie[d] a reasonable assumption that [he] consent[ed]."  First Republic, 421 B.R. at 682.

In any case, the Partnership actually performed under the swap transaction for a period of about three years.  Between August 1, 2004 and January 2, 2008, the Bank and the Partnership exchanged monthly settlement payments under the swap transaction a total of 41 times.  (Pl. Stmt. ¶ 58; Def. Resp. ¶ 58).  The Partnership accepted the "benefits" of the swap transaction -- that is, a lower net interest rate on the entities' mortgage loans with the Bank.  Defendants are bound by the terms of the agreement.

### 2.   Interpretation of Contractual Terms

#### a.   Applicable Law

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992).  "[I]f a contract is unambiguous on its face, its proper construction is a question of law."  Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).

A court must give contract terms their plain meaning, and it may find ambiguity only if a term is reasonably susceptible to more than one interpretation by reference to the contract alone.  See Krumme v. WestPoint Stevens Inc., 238 F.3d

133, 139 (2d Cir. 2000); Burger King Corp. v. Horn & Hardart Co.,
893 F.2d 525, 527 (2d Cir. 1990). "Contract language is
unambiguous if it has a definite and precise meaning, unattended
by danger of misconception in the purport of the contract itself,
and concerning which there is no reasonable basis for a
difference of opinion." RJR Nabisco, 906 F.2d at 889 (internal
quotations and citation omitted). "Language whose meaning is
otherwise plain is not ambiguous merely because the parties urge
different interpretations in the litigation." Id.

### b. **Application**

Part 1(g) of the Schedule provides that "an Additional
Termination Event shall occur upon termination of any agreements
between [the Bank] and [the Partnership]." (Schedule Part I(g)).
When the entities (including the Partnership) paid off their
seven mortgages with the Bank and refinanced with a different
lender in January 2008, the Bank interpreted that payoff as a
"termination" of an "agreement." The Bank declared the
occurrence of an "Additional Termination Event" under the swap
transaction, took steps to unwind the interest rate swap, and
charged the Partnership a "payment upon early termination." (Pl.
Stmt. ¶ 68; Def. Resp. ¶ 68).

Defendants argue that the Bank's interpretation of the
word "termination" is unreasonable. Defendants contend that the
early payoff of their mortgages should not constitute a
"termination." (Def. Mem. in Supp. of Def. Mot. for Summ. Judg.
at 21). The Bank, on the other hand, argues that the

- 18 -

interpretation makes sense because the purpose of the early termination clause is to minimize the Bank's risk. (Pl. Mem. in Opp. to Def. Mot. for Summ. Judg. at 14-16). The Bank contends that borrowers are more likely to make monthly payments on a swap transaction when it is an integral part of maintaining their fixed rate mortgage loan. (Id.).

According to Black's Law Dictionary, "termination" has two (similar) meanings. First, it means "the act of ending something; extinguishment." (Black's Law Dictionary (8th ed. 2004)). Second, it means "the end of something in time or existence; conclusion or discontinuance." (Id.). Defendants urge the former definition, and state that there was no affirmative "act" of "ending something"; rather, the mortgage agreements between the Bank and the Partnership ended naturally due to "payoff" or "satisfaction." This is a distinction without a difference. The mortgage agreements between the Bank and the Partnership ceased to exist when the entities paid off their loans: the agreements terminated.

The Bank interpreted the phrase "termination of any agreement" to mean "an end to the existence of any agreement." This is the plain meaning of the phrase. There is no ambiguity, and the defendants' arguments are rejected.

## 3. **Mitigation of Damages**

### a. **Applicable Law**

In a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs. If the

plaintiff fails to mitigate his damages, the defendant cannot be charged with them.  This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense.  See Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., No. 93-3707 (LAP), 2001 WL 99856, *6 (SDNY Feb. 5, 2001) (citing Restatement (Second) of Contracts § 350(1)).  The duty to mitigate damages, also called the doctrine of avoidable consequences, requires only reasonable, practical care and diligence, not extraordinary measures.  See id.

> b.  **Application**

When the entities (including the Partnership) paid off their seven mortgages with the Bank, the Bank exercised its contractual right to declare an "Additional Termination Event" on the swap transaction.  The Bank charged defendants a "payment upon early termination."  The Bank also terminated its opposite interest rate swap transaction that it had entered with a third party as a hedge.  Defendants claim that by taking these actions, the Bank failed to mitigate its damages.  Defendants argue: "if the bank had left both [swap] transactions in place, and both parties had fully performed their monthly settlements through July 2014 as contemplated by the Confirmation, the net financial impact on the bank 'would have been zero.'" (Def. Mem. in Supp. of Def. Mot. for Summ. Judg. at 22 (citing Eilerman Depo. at 55)).

The duty to mitigate damages comes into play once there has been a breach of a contract.  See United States v. Russell

Elec. Co., 250 F. Supp. 2, 20 (S.D.N.Y. 1965) ("A duty to mitigate damages arises when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract."). At the point at which the Bank declared an "Additional Termination Event," defendants had not yet breached the swap transaction. It does not forbid the entities from paying off their mortgages early. But, if an early payoff does occur, the swap transaction provides for a "payment upon early termination" based on the prevailing market value of the interest rate swap at the time of termination. (Master Agreement § 6(e); Schedule Part I(g)). Defendants did not commit a breach of contract until they refused to pay the "payment upon early termination," so the fact that the Bank exercised its right to charge a "payment upon early termination" cannot, itself, constitute a failure to mitigate damages.

In fact, with the luxury of hindsight, it is difficult to understand why the defendants now argue that they would rather that the Bank had left the swap transaction in place rather than declaring an "Additional Termination Event" in January 2008. Since January 2008, the LIBOR has declined precipitously. See Forecast of 6 Month LIBOR Interest Rate, http://forecasts.org /6mlibor.htm (last accessed Mar. 19, 2010). Without the hedge of the Bank mortgages, defendants would have lost a lot of money on the swap transaction over the past two years, and it is unknown what might happen over the course of the next four years. The reason that the swap transaction was a good deal for defendants

in June 2004 was because it was a hedge on their mortgage. Since January 2008, though, it has been an un-hedged, losing gamble.

## C. **Defendants' Counterclaims**

### 1. **Declaratory Judgment**

Defendants seek a judgment declaring that the swap transaction is void because the Master Agreement and Schedule were signed by Darlene, rather than one of the partners of the Partnership. For the reasons already stated, the agreements are enforceable, and this counterclaim is dismissed.

### 2. **Breach of Fiduciary Duty**

#### a. **Applicable Law**

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 168 (1st Dep't 1987) (citing Restatement (Second) of Torts § 874 cmt. a). "Absent extraordinary circumstances, however, parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation." Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006).

"[A]n arm's length borrower-lender relationship is not of a confidential or fiduciary nature." Roswell Capital Partners LLC v. Alternative Constr. Tech., 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) (citation omitted). A lender-borrower

relationship may give rise to fiduciary duty under New York law
where there exists "a confidence reposed which invests the person
trusted with an advantage in treating with the person so
confiding, or an assumption of control and responsibility."
<u>Mfrs. Hanover Trust Co. v. Yanakas</u>, 7 F.3d 310, 318 (2d Cir.
1993) (citation omitted).

### b. **Application**

Defendants claim that the Bank owed defendants a
fiduciary duty because "[the Bank] sought to secure the
confidence and trust of the Defendant[s], and the Defendant[s]
placed [their] trust and confidence in [the Bank]. [The Bank] had
superior expertise and knowledge concerning the Transaction,
. . . whereas the Defendants were unsophisticated as to such
transactions."  (Miota 8/28/09 Decl. Ex. 6, Def. Answers to Pl.
First Set of Interrogatories ("Def. Inter.") ¶ 3).

Defendants have failed, however, to adduce <u>any</u> evidence
that shows that they placed such a degree of confidence in the
Bank that the Bank "enjoyed an advantage" over others or that the
Bank assumed "control and responsibility" over defendants or
their affairs.  The only evidence that defendants can muster are
comments in the Gelhausen and Eilerman depositions that
demonstrate that in general, the Bank wanted its customers to
"trust" it and to "continue doing business" with it.[8]

---

[8]     Q.   And U.S. Bank, I assume, wanted Ables & Hall
             Builders to have confidence and trust in the
             bank as it engaged in these transactions?

As discussed above, a bank's generalized desire for its customers to "trust" it, place "confidence" in it, and "continue doing business" with it, is not sufficient, standing alone, to create a fiduciary relationship with its borrower. Defendants specifically disclaimed the existence of a fiduciary relationship in the swap transaction that they signed. (Confirmation ¶ 3(v) (each party "acknowledges and agrees that the other party is not acting as a fiduciary or advisor to it in connection with the Transaction")). Defendants consulted an outside fiduciary, their attorney, Bruce Neikirk, about the terms of the swap transaction before they consented to be bound. (Def. ¶ 45; Pl. Resp. ¶ 45; Pl. Stmt. ¶ 43; Def. Resp. ¶ 43). They engaged a second attorney

---

    A.    Yes.

(Eilerman Depo at 22).

> Q.    Was it among your objectives to earn the trust of your customers?
>
> A.    Yes.
>
> Q.    Was it among your objectives to have your customers place confidence in you as their relationship manager?
>
> A.    Yes.
>
> Q.    Was it among your objectives to have your customers place confidence in U.S. Bank?
>
> A.    Yes.
>
> Q.    Was it among your objectives for your customers to continue doing business with U.S. Bank?
>
> A.    Yes.

(Gelhausen Depo. at 20-21).

as well. (Letter from Alexander Fraser to James Babbitz).
Finally, defendants are "businessmen engaged in major
transactions" who are presumed under New York law to be able to
protect their own interests. <u>Grumman Allied Indus., Inc. v. Rohr
Indust., Inc.</u>, 748 F.2d 729, 737 (2d Cir. 1984).

Defendants' claim for breach of fiduciary duty is
dismissed because as a matter of law, no fiduciary relationship
existed between the Bank and defendants.

     3.   **Misrepresentation**

         a.   **Applicable Law**

To prevail on their claim for misrepresentation,
defendants must show a false and fraudulent representation and
detrimental reliance. <u>See</u> <u>Robinson v. Deutsche Bank Trust Co.
Americas</u>, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008). Any reliance
on a supposed misrepresentation must be justified. <u>See</u> <u>Guilbert
v. Gardner</u>, 480 F.3d 140, 147 n.5 (2d Cir. 2007). Unless there
is a special relationship of trust between two parties, or the
representing party has vastly superior knowledge, experience, or
education, courts will not grant relief in situations where
simply reading the contract would have settled the issue. <u>See
Grumman Allied Indus.</u>, 748 F.2d at 737; <u>Granite Partners, L.P. v.
Bear, Stearns & Co. Inc.</u>, 58 F. Supp. 2d 228, 259 (S.D.N.Y.
1999); <u>see also</u> 4 Williston on Contracts § 69:35.

"[T]he signer of a deed or other instrument . . . is
conclusively bound thereby. . . . If the signer could read the
instrument, not to have read it was gross negligence; if he could

- 25 -

not read it, not to procure it to be read was equally negligent; in either case the writing binds him." <u>Pimpinello v. Swift & Co.</u>, 253 N.Y. 159, 162-63 (1930).

### b. **Application**

Defendants assert that "[the Bank] made false representations of material fact upon which they intended [defendants] to rely, and upon which [defendants] did rely to their detriment." (Counterclaim ¶ 15). Defendants point to two particular alleged misrepresentations -- one in 2004 and one in 2007. As a matter of law, there can be no justified reliance on either.

First, defendants claim that in 2004, the Bank led them to believe that they were simply "swapping" a new "fixed rate loan package with no prepayment penalty" for their existing debt -- rather than entering into a complicated swap transaction that did entail a "payment upon early termination." (Counterclaim ¶ 4).

The face of the Master Agreement, Schedule, and Confirmation, however, directly contradict this characterization of the transaction. The Confirmation states that the "type of transaction" that it governs is an "interest rate swap." (Confirmation at 1). The swap transaction's documents contemplate the possibility of a "payment upon early termination," and they state that the swap transaction will terminate if the Partnership terminates any of its other agreements with the Bank. (Master Agreement §§ 6(b)(iii)(2),

6(e); see Confirmation Part I(f)).  Accordingly, even if defendants could establish that the Bank did tell Ronnie that he was entering a "fixed rate loan package with no prepayment penalty," it does not matter.  As a matter of law, it was unreasonable for the Partnership to rely on such an oral statement when it contradicts the plain terms of the swap transaction.

        Second, defendants claim that in 2007, the Bank "misled" defendants by providing loan payoff amounts that did not contain any reference to any claim that there would be a "payment upon early termination" in connection with the swap transaction. (Counterclaim ¶ 8; Def. Stmt. ¶ 48).  The Bank admits that they provided loan payoff amounts to defendants on July 31, 2007, and that the figures did not contain any reference to the swap transaction.  (Pl. Resp. ¶ 48).  This is not surprising.  The swap transaction is a separate agreement, with separate consequences.

        Terminating the mortgages is what triggered termination on the swap transaction.  But the "payment upon early termination" was pursuant to a clause in the swap transaction -- not pursuant to a clause in the mortgage agreements.  In any case, as a matter of law, there can be no justified reliance on the July 2007 payoff report because the Bank did warn the Partnership in writing on at least two occasions -- in September 2007 and December 2007, both before the Partnership refinanced their loans in January 2008 -- that paying off the entities'

- 27 -

mortgages early would result in separate consequences in the swap transaction.  (Sutton Email; Letter from Alexander Fraser to James Babbitz).  When businesspeople engaged in major transactions fail to exercise care in their affairs, "New York courts are particularly disinclined to entertain claims of justified reliance."  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541, 1543 (2d Cir. 1997).

To the extent that defendants argue that they should be protected because they had a "special relationship of trust" with the Bank or had vastly inferior knowledge, these claims are rejected.  I already addressed the contention that there existed a "special relationship of trust" in the context of the claim for breach of fiduciary duty.  As for the latter contention regarding "inferior knowledge," defendants are businessmen who manage and operate commercial property worth upwards of $7 million.  See Grumman Allied Indus., 748 F.2d at 739.  In consenting to be bound by the Schedule, defendants agreed that they had the capacity to evaluate the agreement (either on their own or through independent professional advice).  (Schedule § (e)(1)).  Indeed, they did engage independent professional advice when they consulted an attorney about the transaction.  (Def. Stmt. ¶ 45; Pl. Resp. ¶ 45; Pl. Stmt. ¶ 43; Def. Resp. ¶ 43).  Defendants cannot pretend to be dupes to escape their contractual responsibilities.  The claim for misrepresentation is denied because even if defendants could prove that the alleged

misrepresentations occurred, there is no justified reliance as a matter of law.

### 4.   <u>Breach of Good Faith & Fair Dealing</u>

#### a.   <u>Applicable Law</u>

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384, 389 (1995). The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Id.</u> (citations and internal quotations marks omitted). "The duty of good faith and fair dealing, however, is not without limits." <u>Id.</u> (citations and internal quotations marks omitted). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." <u>Cross & Cross Props., Ltd. v. Everett Allied Co.</u>, 886 F.2d 497, 502 (2d Cir. 1989).

The implied covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400, 408 (2d Cir. 2006) (citation and internal quotation marks omitted).

b.   **Application**

Defendants' claim that the Bank breached the covenant of good faith and fair dealing rests upon identical factual allegations as their claims for misrepresentation and breach of fiduciary duty.  (Defs. Inter. ¶ 4 (identifying all facts supporting defendants' allegation that the Bank breached a duty of good faith and fair dealing by incorporating defendants' responses to interrogatories about alleged misrepresentations and an alleged fiduciary duty)).  When the Bank declared an Additional Termination Event and charged a payment upon early termination, the Bank was exercising its rights under the contract.  The implied covenant "does not extend so far as to undermine a party's general right to act on its own interests." Thyroff, 460 F.3d at 408.  Defendants may not employ the covenant as a means of forcing the Bank to forbear from exercising its contractual rights.

## CONCLUSION

For the reasons set forth above, the Bank's motion for summary judgment is granted and defendants' motion for summary judgment is denied.  The Bank is directed to submit a proposed judgment on notice within seven days of this decision.

SO ORDERED.

Dated:     New York, New York
           March 19, 2010

           DENNY CHIN
           United States District Judge

- 30 -

**APPEARANCES**

For Plaintiff:

      MICHAEL BEST & FRIEDRICH LLP
          By:  Jacob E. Miota, Esq.
      100 E. Wisconsin Avenue, Suite 3300
      Milwaukee, Wisconsin  53202

          - and -

      SASSON & BLAIVAS LLP
          By:  Moshe Sasson, Esq.
      1350 Broadway, Suite 212
      New York, New York  10018


For Defendants:

      TRAFLET & FABIAN
          By:  Stephen G. Traflet, Esq.
      1001 Avenue of the Americas, 11th Floor
      New York, New York  10018

          - and -

      FULTZ MADDOX HOVIOUS & DICKENS PLC
          By:  John David Dyche, Esq.
      2700 National City Tower
      101 South Fifth Street
      Louisville, Kentucky  40202